(No. 20151.—■)

E. T. SWINEY *vs.* JAMES H. WOMACK *et al.* Appellees.—
(KIT SWINEY, Appellant.)

*Opinion filed February 18, 1931—Rehearing denied April 9, 1931.*

BRYAN H. TIVNEN, (THOMAS R. FIGENBAUM, and CARUS S. ICENOGLE, of counsel,) for appellant.

HARRY I. HANNAH, for appellees.

Mr. COMMISSIONER PARTLOW reported this opinion:

E. T. Swiney filed his bill for partition and the assignment of dower in the circuit court of Moultrie county against appellees, James H., Laura A. and Earl Womack, Beulah Womack Garrett, C. C. Firebaugh, as trustee, and A. E. Poulter. After the bill was filed Swiney made a deed for the land in question to his wife, Kit Swiney, and she was substituted as party complainant. After the bill was filed Laura A. Womack was appointed by the county court of Shelby county as conservator of James H. Womack, and she filed a cross-bill praying for the cancellation of a deed, certain notes and a contract from Womack to Swiney on

the ground of the mental incapacity of Womack to execute them and on the ground of fraud and undue influence of Swiney in securing their execution. Upon issue being joined the cause was referred to a master to take the evidence and report his conclusions. The master found that the original bill should be dismissed for want of equity and that a decree should be entered as prayed in the cross-bill. Exceptions to the report were overruled, a decree was entered as recommended and an appeal was prosecuted to this court.

The principal ground urged for reversal is that the decree is contrary to the law and the evidence.

The evidence shows that James A. Womack died intestate in 1911 seized of 93.81 acres of land in Moultrie county and leaving surviving him his widow, Laura A., and his three children, James H., Earl and Beulah. James H. was then about six years of age. After the death of James A. Womack the family moved to Windsor, Illinois, where Swiney was engaged in the automobile business and the operation of a garage. Laura A. Womack was appointed legal guardian of her minor children by the county court of Moultrie county and she acted as the guardian of James H. until May 1, 1926, when he became of age. and she was discharged. He went through the common schools and attended high school for one year. Appellant contends that he was a boy of average intelligence and ability. His mother testified that he became overheated in his boyhood and when he was about eighteen years of age became despondent because of his health and attempted suicide, and while employed in the shops at Granite City he was severely injured. Two doctors who knew him from childhood, his former school teacher, and three or four other witnesses, testified that his mentality was below the average, that he had the mind of a boy of twelve or fourteen years and that he was not mentally capable of transacting ordinary business. Twelve witnesses called by appellant testified to his mental soundness. He loafed around the garage of Swiney,

in Windsor, and part of the time he was employed there. When he was about sixteen years old Swiney sold him a second-hand Studebaker car. According to Womack the purchase price was $450. According to Swiney it was $250. A note and mortgage were executed for the purchase price. Womack had the car about thirty days when it was surrendered to Swiney but the note was not returned and it enters into the later transaction. In 1922 Swiney sold Womack a Ford car for $150, and a note and mortgage were executed. The car was later surrendered to Swiney but this note also enters into the later transaction. In 1925 Swiney sold Womack another Ford car for $275 and took a note and mortgage. The car was surrendered but this note enters into the transaction. During all of these transactions Womack was a minor and had no use for the cars. His mother was his guardian and did not consent to the purchases.

About 1921 Womack began endorsing notes for various persons who bought cars of Swiney, some of which endorsements were made without the knowledge of the principals on the notes, some of whom were entire strangers to Womack. Womack testified that he had no knowledge or memory of endorsing any of these notes except the $1000 note of Forrest Lovins. Swiney testified he knew Womack was a minor but had in mind the fact that he would come into possession of this land and the notes would be good. He admitted that Womack received nothing for his endorsements. He said that one or two of the principals on some of these notes had endorsed notes for Womack, but Womack and the principals denied this statement.

In 1921, when Womack was about sixteen years of age, he left Windsor and worked in Kankakee and several other places. On May 1, 1926, the day he was of age, he returned to Windsor. He and his mother went to Sullivan, where she filed her final account as guardian and was discharged. The next day Womack traded a second-hand Buick car

owned by him for a Chevrolet car owned by Swiney, valued at $600. Womack testified that he was to receive $200 for his Buick and he gave his note and mortgage to Swiney for $475.68; that Swiney said he would have to have a mortgage on Womack's interest in the land to secure this transaction, and a warranty deed was executed by Womack to Swiney which was intended as a mortgage, the description being filled in with a lead pencil. The next day Swiney took the deed to Sullivan and from the records put in the correct description in ink and had the deed recorded. Swiney testified that he did not take the Buick for $200 but was to sell it, with the understanding that he would credit Womack with whatever was obtained from its sale; that Womack gave him his note for $240 to cover the down payment plus two other items; that as a part of this same transaction Womack on the same date executed three other notes, for $444.52, $832.83 and $2345.93, respectively; that the first and third notes were to take up notes which Womack had signed while a minor, as security for other principals who owed Swiney, and that the second note was to take up some notes and an open account which Womack had incurred while a minor. Womack testified that he did not sign these notes, or that he had no knowledge of signing them. On the same date a purchaser's statement which Swiney used in his business in selling notes and mortgages to a finance company was executed. The answers to the questions in the statement are in the handwriting of Swiney. They state that Womack was the owner of thirty acres of land worth $4000, upon which there was no mortgage and that no past debts were owing by Womack. Following Womack's signature was a statement signed by Swiney as follows: "The undersigned does not warrant the above purchaser's statement but in good faith believes the same to be true and warrants that the down payment as listed has been paid in full by the purchaser in cash or trade, or both, and that no portion of the same is owing by separate

note or open account." This statement was not true in several respects.

After this transaction Womack went to Kankakee to work and from there he went to Cairo. He made default in the payments on the Chevrolet car and the finance company endeavored to locate him. On December 6, 1926, Swiney wrote to Womack that he was delinquent in his payments to the finance company. He told him to make himself scarce around Windsor and vicinity for some time because there was a warrant out for him. He enclosed a quit-claim deed from Womack to Swiney for the land in question and asked him to go before a notary public and execute it. He asked him to drive the car to some other town and send Swiney the name of the garage in which it was left and Swiney would send for the car, but that Womack was to stay "in the clear" at all times until Swiney told him to come; that Womack was booked in police courts, and for him to get his real estate out of his name and stay out of Windsor for a while. The evidence shows that there was no warrant out for Womack and that Swiney knew where he was all of the time but did not tell the finance company. In response to this letter Womack wired Swiney to meet him in St. Louis, but Swiney replied by letter telling Womack to leave the car at Carbondale in a garage and send Swiney the ticket for it, sign the bill of sale enclosed and return it with the other papers. The car was later surrendered by Womack to the finance company.

On December 21, 1926, Swiney again wrote to Womack telling him that there was a warrant out for him. On December 26, 1926, Swiney wrote to him telling him that his note for $240 was due on November 2, 1926, and asking payment of the same. This note was payable on demand, yet Swiney fixed November 2, 1926, as the date on which it should be paid. On February 17, 1927, Womack had a talk with Swiney in Windsor. Swiney wanted him to pay the $240 note. Womack testified that he did not

know what the note was for but that he relied upon Swiney and trusted him and he told Swiney if the land could be sold he would pay the note. Swiney asked the privilege of selling the land, and on the following day he drew an instrument which directed him to sell, at either public or private sale or in partition, the one-third interest of Womack in the land inherited from his father. The instrument directed Swiney to collect the purchase price so that the total, principal and interest, of the three notes of May 2, 1926, and the note of $240 would be paid out of the proceeds of sale. The contract recited that all these notes were past due and no part of them had been paid. The instrument recited that Womack confirmed in every way the deed from him to Swiney and the title of the purchaser from Swiney, except that the balance of the proceeds was to be paid to Womack. Womack testified that this instrument was executed in duplicate; that Swiney kept both copies; that Womack had the instrument in his hands before he signed it but did not read it but relied on the statement of Swiney that it was merely to give him power to sell the land for the purpose of settling the $240 note, and that nothing was said about the other three notes named in the instrument. It is upon this instrument that appellant seeks to convert the mortgage into an absolute deed. Swiney testified that these three notes of May 2, 1926, and the $240 note, constitute the consideration for the deed, and that when the instrument of February 17, 1927, was executed these four notes were canceled but not surrendered to Womack, and that in settling them he released the three principal notes without consulting the surety.

Swiney testified that the $444.52 note was signed by Emil Wagner and Womack and was given to take up what was originally a note for $375 given in 1921 by Forrest Lovins for a Ford sedan; that Womack did not sign the original note but did sign this note on February 6, 1926, as security. He received no consideration for it and the in-

terest brought it up to $439.44. Lovins testified that he did not know that Womack ever signed this note, that he never requested him to sign it, and that at the time it was signed he and Womack were in the employ of Swiney.

Swiney testified that the $832.83 note was given to cover the note which Womack gave in 1921 for the Studebaker car, the note for the Ford car bought in 1922, the note he took from Womack in March, 1925, for another Ford car, and the balance was to cover a small book account for automobile accessories bought by Womack.

Swiney testified that the $2345.93 note was given to take up several notes signed by Womack as security for others. Among them was the $1000 note of Forrest Lovins, dated February 6, 1925, which Womack admitted he signed at the request of Swiney. Womack testified that Swiney told him it was merely for the accommodation of Swiney and that it would never cost Womack anything. Lovins testified that he had no knowledge of Womack signing any of his notes as security; that the $1000 note was in fact given to cover a $1000 note of Charles Shewmake which Swiney had transferred to him, and that he afterwards learned that this $1000 note had been discharged in bankruptcy before it was assigned to him. This last statement is denied by Swiney. Swiney testified that the note for $2345.93 was also for a $200 note and a $236 note of Ralph and Grant Woods, which Swiney testified Womack had signed as security. Grant Woods testified he did not know Womack and never requested him to sign his note. Ralph Woods testified he never requested Womack to sign any of his notes and did not know he had signed them. Included in this $2345.93 note was a book account of Ralph Woods for $70.40, for which Swiney testified Ralph and Grant Woods gave their note, which was signed by Womack as security. The last item in this note was a $400 note of Henry Williams purporting to be signed by various parties and Womack for a car sold to Williams. Williams testified

he did not know Womack and did not know he signed this note. Emma Williams testified she was present when this note was executed, that Womack was not present, that she did not know him and never saw him until the date of the hearing, and that she did not sign the note. A salesman for Swiney testified he sold this car to Williams and in order to get his commission he had to get two securities; that he did not know who requested Womack to sign it, but Womack signed it in Swiney's office in the presence of himself, Swiney and Williams. Swiney testified that this transaction took place in 1924, but the salesman testified it took place in 1921 and that Womack was not present when Williams signed the note. Both Williams and his wife testified that Williams signed the note about ten o'clock at night in Swiney's garage and no one was there except Swiney, the salesman and Williams. They testified there were four $100 notes instead of one $400 note. Womack testified he was not present and did not sign the note and never saw the Williams'.

Swiney testified that the $240 note was the down payment on the car sold May 2, 1926, but he is contradicted by the purchaser's statement, which is in his own handwriting and which he warranted over his signature to be true, in which he stated that no note was given for the down payment and that Womack owned land unencumbered and owed no past due debts.

There are other facts in evidence, but those above recited are the principal facts. Counsel on both sides argue at great length the conflicts and contradictions in the evidence and the conclusions to be drawn from certain portions of the evidence. It will not be necessary to consider in detail these points for the reason that there are certain outstanding facts which are sufficient to determine the questions at issue.

The original bill was properly dismissed for want of equity. Neither appellant nor her husband had title to the

real estate. Their claim is based upon the deed of May 2, 1926, and upon the order or contract of February 17, 1927. From these two instruments it is apparent that the deed, while it is absolute upon its face, was, at most, only a mortgage. The contract states that the notes which Swiney says were the consideration for the deed had not been paid but were to be paid when the land was sold, therefore the deed and contract were security for the payment of those notes. Swiney was to deduct from the purchase price sufficient money to pay all of the indebtedness and the balance was to be paid to Womack. The contract does not authorize Swiney to execute a deed and without such power he could not make a deed. If he could not make a deed he could not file a bill for partition. The holder of a deed given as a mortgage to secure a loan is not the owner of such an interest in the fee as will entitle him to maintain a bill for partition. (*Dazey* v. *Brinkley*, 285 Ill. 513.) Swiney conveyed to appellant after the bill and cross-bill were filed, and she took by her deed no greater title than her husband had, and he was without authority to file a bill for partition.

The next question is whether the findings of the decree upon the cross-bill are sustained by the law and the evidence. The allegations of the cross-bill are, that Womack was mentally incompetent to make the deed, contract and notes and that they were obtained from him by Swiney by fraud and undue influence. Where a suit is instituted in a court of chancery relative to the person or property of an infant he is treated as the ward of the court and under its special protection. (*Alford* v. *Bennett*, 279 Ill. 375; *Grattan* v *Grattan*, 18 id. 167; *King* v. *King*, 15 id. 187.) Contracts and notes made by infants are voidable and may be repudiated within a reasonable time after the infant reaches full age. (*Rubin* v. *Strandberg*, 288 Ill. 64; *Wright* v. *Buchanan*, 287 id. 468.) In order to ratify a contract made during infancy the act relied upon as a ratification must be performed with full knowledge of its consequences

and with an express intent of ratifying what is known to be voidable. Where the same lack of knowledge exists at the time of the alleged ratification as existed at the time of the execution of the original contract or deed the ratification is a part of the original transaction and the ratification is ineffectual. (*Coe* v. *Moon,* 260 Ill. 76; *Sayles* v. *Christie,* 187 id. 420; *McCarty* v. *Carter,* 49 id. 53; *Davidson* v. *Young,* 38 id. 145.) Even where one has personally enjoyed the benefit of the consideration for the conveyance of land while a minor, he is not bound in every case to restore the consideration before he is permitted to avoid the deed. The general rule is, that where the consideration of a conveyance by an infant has been expended so that he is not in a position to restore the consideration he may nevertheless avoid the conveyance. It is only when he still has the consideration that he will be compelled to return it. (*Wuller* v. *Chuse Grocery Co.* 241 Ill. 398; *Reynolds* v. *McCurry,* 100 id. 356; 1 Wait's Actions and Defenses, 142.) Fraud may be proved by circumstances which convince the mind of its existence. (*Wolf* v. *Lawrence,* 276 Ill. 11; *Cohen* v. *Friedman,* 259 id. 416.) It may be inferred from facts and circumstances shown and inferences deducible therefrom, based upon the possibilities of human conduct. (*Podolski* v. *Stone,* 186 Ill. 540.) Courts of equity have held that if an instrument is obtained from persons ignorant of their rights but whose rights are known to the party obtaining the instrument they will be relieved even though no fraud or imposition has been practiced. (*Dazey* v. *Brinkley, supra; Whitney* v. *Roberts,* 22 Ill. 381.) Even where there is no actual fraud, courts of equity will frequently relieve against hard and unconscionable contracts which have been procured by taking advantage of the condition, circumstances or necessity of the other parties, especially if such contracts are made by parties acting in a fiduciary capacity. (12 R. C. L. 236.) A fiduciary relation exists in all cases in which influence has been acquired

and abused. The origin of the confidence is immaterial. It may be moral, social, domestic or purely personal. If the confidence is, in fact, reposed by the one party and accepted by the other the relation is fiduciary, and equity will regard dealings between the parties according to the rules which apply to such relation. *Seeberger* v. *Seeberger,* 325 Ill. 47; *Kochorimbus* v. *Maggos,* 323 id. 510; *Higgins* v. *Chicago Title and Trust Co.* 312 id. 11.

Most of the financial transactions upon which this case is based took place while Womack was over sixteen and under twenty-one years of age. The master found that Swiney was a man of keen intellect and of large and wide experience in business. This finding is sustained by the evidence. On the other hand, the oral evidence is in conflict as to the mental ability of Womack, but aside from the oral evidence the undisputed facts show his utter inability to cope with the superior experience and knowledge of Swiney. A boy of sixteen, without experience in business, would not be expected to be able to cope with such an adversary, and the transactions show that he did not so cope. Swiney sold him four second-hand cars for more than the evidence shows they were worth. Womack did not need any of these cars. He had no money to pay for them. They were taken back in a very short time after they were purchased. Womack received no benefit from any of them, but when they were taken back he permitted the mortgages and notes to remain in the hands of Swiney, and each of these notes is a part of the consideration upon which Swiney's claim is based in this case. Womack was not only a minor under guardianship but the sales were made by Swiney over the protest of the guardian. Each of the sales was voidable, and the actions of Swiney in these respects show an utter lack of good faith and an intention and purpose to use Womack for his own financial gain and to secure possession of the land inherited by him from his father. Swiney induced Womack to endorse notes without cause

or consideration. The principals on the notes endorsed were mostly persons who were entire strangers to Womack—persons who did not know that he signed the notes as security. Why this was done does not clearly appear, unless it was that Swiney wanted to comply with some rule of the finance company with reference to the number of securities on the notes. By this method several thousand dollars of indebtedness was incurred. These actions were sufficient in themselves to establish the utter inability of Womack to look after his own interests as against Swiney and show an entire lack of good faith on the part of Swiney. His acts on the day after Womack became of age further add to the evidence against him. He knew he had been dealing with a minor who was under legal disabilities and knew the necessity of the ratification of those acts if he expected to collect any of the money which he claimed was due. On the very next day after Womack became of age Swiney made a deal with him, selling him a car, taking notes and mortgages and getting a deed from Womack for his share in his father's estate. This ratification was not made in accord with the rules of law herein announced and consequently was of no force and effect. Womack knew no more about the legal effect of this ratification than he did of the transactions when he was sixteen years old. The deed conveyed no title, nor can it be considered even as a mortgage. After he got this deed Swiney wrote to Womack stating facts which were not true. The apparent intention of his letters was to make Womack afraid to go home and to induce him to get rid of the title to his property. The most of the considerations for the four notes described in the contracts were debts on which Womack should not be held liable. The balance was for goods purchased which have been used and cannot be returned. The evidence shows that Swiney by his course of dealing secured the confidence of Womack and then used that confidence for business reasons,

with the thought in mind that Womack was financially responsible and Swiney could secure his property.

The evidence amply sustains the findings of the decree that the deed, contract and notes were secured by fraud and undue influence on the part of Swiney, that Womack was mentally incompetent to transact the business which he had with Swiney and that his acts were not legally ratified, and the decree properly found that the deed, contracts and notes should be canceled.

The decree is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*