Perry V. CARTWRIGHT, Appellant,

v.

Lillian MINTON et al., Appellees.

No. 3401.

Court of Civil Appeals of Texas.

Eastland.

Nov. 7, 1958.

Rehearing Denied Dec. 5, 1958.

**450**

Stubbeman, McRae, Sealy & Laughlin, Midland, Brookreson & Brookreson, Seymour, Joe Reeder, Jr., Knox City, for appellant.

Nelson & Sherrod, Wichita Falls, for appellees.

WALTER, Justice.

In this case Lillian Minton sought to cancel a quitclaim deed which she executed on May 3, 1950, to Perry V. Cartwright conveying to him her undivided interest in approximately 7,975.02 acres of land in Knox, Baylor and Brewster Counties. Mrs. Margaret Flesher and her husband sought to cancel a quitclaim deed which they executed to Perry V. Cartwright on May 3, 1950, to their undivided interest in approximately 7,975.02 acres of land in Knox, Baylor and Brewster Counties. Mrs. Minton and the Fleshers contended there was a fiduciary relationship between them and Cartwright in that Cartwright was the duly appointed, qualified and acting independent executor under the will of Thomas J. Cartwright, deceased, and that they were residuary beneficiaries under said will to the land they conveyed. They also contended that Cartwright made fraudulent representations to them which induced them to sign the deeds. Cartwright pleaded that no fiduciary relationship existed; that he made no misrepresentations and that Mrs. Minton and the Fleshers had voluntarily executed the deeds and were estopped to question his title. He also pleaded the two and four year

statutes of limitation, Vernon's Ann.Civ. St. arts. 5526, 5529 and adverse possession under the three, five, ten and twenty-five year statutes of limitation, Vernon's Ann. Civ.St. arts. 5507, 5509, 5510, 5519.

A jury's verdict was favorable to Mrs. Minton and the Fleshers, and judgment was entered setting aside the deeds. Cartwright has predicated his appeal from said judgment on fifty-three points of error fully set out in the appendix of his brief. He asserts that for the convenience of the court and in the interest of brevity the major questions involved are stated in six general points which are substantially as follows: (1) the error of the court in regarding appellant as a fiduciary at the time the quitclaim deeds were executed by appellees (2) in refusing to hold there was no fraud practiced upon appellees by appellant (3) in failing to apply the four year statute of limitations (4) in overruling appellant's objection to testimony regarding a federal court judgment in the case of M. J. Murphy v. Perry V. Cartwright (5) in admitting evidence of discussions between Cartwright and Mrs. J. M. Murphy in violation of the rule of res inter alios acta and (6) in overruling appellant's exceptions to argument of counsel for appellees.

Thomas J. Cartwright died testate on January 24, 1949. After directing that all of his debts be paid, he devised and bequeathed to his only son, Perry, a life estate in all of his property and his son was named independent executor. The appellee, Mrs. Minton, under the Cartwright will, was a remainderman of a ⅛th of a ⅛th interest subject to the life estate of appellant and Mrs. Flesher was also, under the Cartwright will, a remainderman of a ⅛th of a ⅛th interest subject to the life estate of appellant. The appellant probated his father's will on February 28, 1949, in Brewster County and took his oath and qualified on the same date.

On March 7, 1949, the original inventory and appraisement were filed by the ap-

pellant showing 4,435.56 acres of land in Brewster County appraised at $7 per acre and town lots in Brewster County valued at $1,650. 2,817.7 acres of land were inventoried in Knox County (the amended inventory shows this acreage to be in both Knox and Baylor Counties). 900 acres of farm land was valued at $14 per acre and 1917.7 acres of grass land was valued at $6 per acre. In addition to the real estate, the inventory revealed the estate had $8,-173.74 in cash.

On April 14, 1950, appellant filed what he designated as an amended and corrected inventory and appraisement, which was approved on April 17, 1950. In this amended inventory appellant individually claims to be the owner of one-half of the realty that was shown in the original inventory to be an asset of the estate. After filing the amended inventory, the appellant had his attorney prepare some eighteen or twenty quitclaim deeds for the owners of the remainder interests to sign conveying to him individually their interest in about 7,000 acres of land.

Appellant testified that he knew the appellees and where they lived and for more than a year after the will was probated he did not get in touch with them in any way or inform them that there was a will or that they had an interest in said estate and gave as his reason, "Well, I didn't see that they were in the will, until after my death, and that it was all mine during my lifetime." This testimony clearly demonstrates that appellant knew and recognized appellees' interest in his father's estate. The appellant and his attorney were on the road about ten or twelve days in this and at least one other state securing the signatures of the remaindermen to these quitclaim deeds.

The appellees lived in Dallas and appellant and his attorney and others first went to the home of Mrs. Flesher. Appellant did not inform her of the size or value of the estate; neither did he show her a copy of the will. When asked what he

told her about the deed, the appellant said he told her he had a chance to sell some of the town lots in Alpine but after talking to his attorney he was informed he could not sell them until he got the property cleared up to where it would all be in his name. He said he considered the property belonged to him. But, he also stated that he considered that the appellees had no rights in the property until his death. When asked if he intended to get a deed from them and cut them off after his death, he stated the property was his and nobody else had a right to it. He frankly admitted that he told appellees that it was his property. He admits that he told them about the lots in Alpine and told them he had a chance to sell them but could not make title to them. He then stated that the deeds that he had appellees sign actually conveyed to him all the property listed in the inventory that he filed in his father's estate. He admits that he did not tell the appellees what property the deeds covered. When asked, "But they—you told them they were to get it at your death?", he answered "What was left."

Before contacting Mrs. Flesher's husband, they went to see the appellee Mrs. Minton. Appellant testified that he made about the same representations to her as he did to Mrs. Flesher. Before entering Mrs. Minton's house appellant had never written her and informed her about the will or the estate or the size of the estate or about her interest in the estate.

Mrs. Flesher testified she was in the bathroom getting ready to go to McKinney when one of the party traveling with appellant knocked on her bathroom door and informed her she had company. She came out and went into the bedroom and appellant told her he had some legal papers for her to sign. He represented to her he had some lots in Alpine and had a buyer for two of them and wanted to sell them because they were of no use to him and he did not want to build on them. He further represented to her that before

he could sell them he would have to get a deed signed by each of his father's beneficiaries. She further testified that appellant did not inform her that the deed contained the land in Brewster, Baylor and Knox Counties and that he did not tell her that by signing the deed she was signing away her rights under the Cartwright will. He represented to her that the deed covered these two lots in Alpine. She testified that it had been fifty years since she had seen her cousin, Perry Cartwright, and that Cartwright and his party were in her house only about fifteen minutes while the matter about the deed was explained to her. She further testified that appellant represented to her that he wanted his father's will carried out just as he wrote it and that the deed did not pertain to his father's will, but only the two lots. Her testimony further reveals that she did not question appellant after he told her it just concerned the two lots. She testified that she relied upon appellant's representation and would not have signed the deed had she known the whole estate was included. She testified that they left the house and started driving down the street looking for a notary and when they found one, appellant stayed in the car and his lawyer went in with her and they were in a hurry and, relying upon what appellant told her, she signed the deed without reading it.

Mrs. Flesher's husband testified that he was a carpenter and was on the job working when appellant and his attorney and others came by after him. They told him they had some legal papers they wanted him to sign so Perry could sell the two lots in Alpine, but that it did not affect the will. He stated that this conversation was had in about five or ten minutes while he was standing by the car and that the deed was not shown to him until he arrived at the notary's office.

Lillian Minton testified she had never signed or seen a deed before appellant and his attorney came to her house in Dallas. Appellant told her that he and his father had two lots in Alpine that he had a chance to sell and told her she was a beneficiary in his father's will and wanted her to sign the deed so he could sell these two lots. Mrs. Minton was working at the A & P Bakery and as appellant drove up to her house the bus she used in going to and coming from her work passed her house going to the end of the line, which took about fifteen minutes. She, appellant and his lawyer walked across the parking lot to a bank looking for a notary. When they arrived at the bank, appellant's lawyer took the papers out of his pocket and asked for a notary and, when one was located, appellant's lawyer opened the papers and laid them on the desk and showed her where to sign at the bottom. She further testified she could not have read the instrument because she did not have her glasses with her and she further testified that the instrument was not read to her and she signed it because appellant had told her that it was just for two lots. She testified that appellant represented to her that signing this deed did not affect her rights under the will and that his father's will would be carried out just as he wrote it; this representation was made to her more than one time on the way to the bank. Her testimony was that she relied on what appellant told her as being the truth and that was the reason she signed the deed. When asked on cross-examination, after identifying her signature and the deed she signed, "All of that was there before you, was it not?", she replied, "Well now, I didn't notice it, I was in a hurry and they was in a hurry. They were detaining me from my work." When asked if the notary could tell if she were reading the deed or not, she replied, "Well, I don't guess she could, because she was just like we was, she was in a rush to go to lunch and I was in a rush to go to work." When they came out of the bank she noticed her bus going to town, and she missed her bus and

was thirty minutes late to work. She further testified that appellant and his lawyer were with her about twenty minutes from the time they arrived until they departed with her signature to a deed conveying to appellant all of her interest in about 7,000 acres of land.

■ Appellant's points that the court erred in treating appellant as a fiduciary and in refusing to hold there was no fraud practiced upon appellees by appellant are overruled. The probate proceedings in the Thomas J. Cartwright Estate were introduced in evidence and they conclusively show that appellant was the duly appointed, qualified and acting executor under his father's will. He took his oath on February 28, 1949. The Fleshers and Minton quitclaim deeds are dated May 3, 1950. On November 15, 1951, appellant filed his affidavit for inheritance tax appraisement. This evidence conclusively demonstrates that appellant was the executor under his father's will and continued to discharge his duties as executor after he obtained the deeds from appellees. "The term 'fiduciary' is derived from the civil law. It is impossible to give a definition of the term that is comprehensive enough to cover all cases. Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction. The term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations. 25 C.J. p. 1118; Peckham v. Johnson, Tex. Civ.App., 98 S.W.2d 408; Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L.R. 720; Swiney v. Womack, 343 Ill. 278, 175 N.E. 419; Abbitt v. Gregory, 201 N.C. 577, 160 S.E. 896; Niland v. Kennedy, 316 Ill. 253, 147 N.E. 117; Lindholm v. Nelson, 125 Kan. 223, 264 P. 50; Roecher v. Story, 91 Mont. 28, 5 P.2d 205; Roberts v. Parsons, 195 Ky. 274, 242 S.W. 594; Seely v. Rowe, 370 Ill. 336, 18 N.E.2d 874;

Bliss v. Bahr, 161 Or. 79, 87 P.2d 219." Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509, 512.

Fraud and misrepresentations had been properly pleaded, sufficient evidence was introduced to warrant the submission of such issues to the jury and the jury answered these issues favorably to appellees. In a similar case involving this same appellant and another beneficiary under the Cartwright will on almost identical facts, the Federal Court held that the appellant was guilty of fraud as a matter of law and said: "Appellant urges that under these facts it is clear that appellee was guilty of fraud, actual or constructive, in procuring the quitclaim deed, and because of this she is entitled to have it cancelled. We agree that under the facts here this contention is correct. As executor of the estate, appellee occupied a position of trust to all parties having an interest in the estate. Because of his confidential and fiducial relationship to appellant he owed her the higest degree of fidelity. Strates v. Dimotsis, 5 Cir., 110 F.2d 374. It was his duty to fully and fairly disclose to her all of the pertinent facts as candidly as possible. The law will not permit him to take advantage of those whom he represents. Thaw v. Thaw, 2 Cir., 27 F.2d 729; Collier v. Collier, 137 Ga. 658, 664, 74 S.E. 275. When a person sustains toward another a position of trust and confidence, his failure to disclose facts that it is his duty to disclose, is as much a fraud as an actual misrepresentation of the true facts. Eddy v. Eddy, 6 Cir., 168 F. 590. In Hand v. Errington, Tex.Com.App., 242 S.W. 722, the Court declined to recognize as binding an agreement between a daughter and her father relating to her share in community property, holding that the father's failure to reveal the true status of the community property amounted in law to concealment, and under these circumstances concealment is fraud. See also, Hickman v. Stone, 69 Tex. 255, 5 S.W.2d 833.

While the facts of this case indicate that appellee did not exercise good faith in pro-

curing the quitclaim deed, it is not necessary for us to so hold, for under the circumstances here, the failure of the fiduciary to make a complete and fair disclosure of all of the material facts relevant to his father's estate constituted fraud as a matter of law and evidences conduct which a court of conscience will not tolerate. It follows that the trial court's finding to the contrary is clearly erroneous and must be set aside." Murphy v. Cartwright, 5 Cir., 202 F.2d 71, 73. "Fraudulent representations may consist of half-truths calculated to deceive". Sullivan v. Helbing, 66 Cal.App. 478, 226 P. 803, 805.

"As a matter of principle it is necessary to weigh the advantages of certainty in contractual relations against the harm and injustice that result from fraud. In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. No one advocates a return to outworn conceptions. The same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices." Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 558, 133 A.L.R. 1349, quoted with approval by our Supreme Court in Dallas Farm Machinery Co. v. Reaves, Tex., 307 S.W.2d 233.

█ The appellant's point that the court erred in failing to apply the four year statute of limitations as a bar to appellees' causes of action is without merit because this issue was properly raised by the pleadings and the evidence.

It is true that more than four years had elapsed from the date of the deeds before this suit was filed. However, fraud prevents the running of the statutes of limitation until the fraud is discovered, or should have been discovered, by the exercise of such diligence as would be exercised by a person of ordinary care and pru-

dence. Glenn v. Steele, Tex., 61 S.W.2d 810.

Appellant has briefed this point in two sections, namely, (a) suit barred as a matter of law and (b) no finding that appellees could not have discovered the claimed fraud within the four year period. The appellant was in possession of the property described in the deeds as a life tenant. He had represented to appellees, before he procured their signatures to the quitclaim deeds, that he wanted his father's will carried out. Appellant carried on correspondence with appellees after he obtained their deeds and did not at any time say anything that would indicate to them that he did not intend for his father's will to be carried out. The evidence, detailed above, clearly demonstrates the fraud and the misrepresentation involved in this case. There was competent evidence introduced by the appellees that they did not discover any facts about the fraud until the first part of 1957 and suit was filed in March of 1957. We hold that the trial court did not err in failing to hold, as a matter of law, that the four year statute of limitations barred appellees' cause of action. Alvis v. McDonald, Tex.Civ.App., 282 S.W.2d 425 and Hutchins v. Birdsong, Tex. Civ.App., 258 S.W.2d 218.

█ Under subdivision (b) of this point appellant asserts the burden was on appellees to prove and secure jury findings that by the exercise of reasonable diligence they could not have found out the nature of the fraud complained of within the four year period. The court submitted special issue number 11 which inquired of the jury whether it found from a preponderance of the evidence that in the exercise of reasonable diligence Mrs. Minton should have discovered the true nature and effect of her deed more than four years before March 30, 1957. Special issue number 12 was a similar issue applied to Mrs. Flesher. The jury answered these issues favorably to the Appellees. Appellant refers us to Hardin v. Hardin, Tex.Civ.App., 1 S.W.2d 708, 709, by this court, in support of his contention

that the trial court erred in misplacing the burden of proof in special issues eleven and twelve. The opinion in the Hardin case reveals that a proper assignment of error was made to the action of the trial court in misplacing the burden of proof. We have examined appellant's objections to the court's charge and failed to find where he made any objections to special issues number eleven and twelve. We hold the court fairly submitted the controlling issues raised by the pleadings and evidence. Failure of the court to submit other and various phases or different shades of the same issues are not grounds for reversal. We are of the opinion that said issues are substantially correct, but, in any event, the appellant failed to point out to the trial court the matter to which he objected and the grounds of his objections; therefore, he has waived any objection he might have to said issues on the burden of proof. Rules 272, 274 and 279, Tex.Rules of Civil Procedure.

■ Appellant's point that the court erred in overruling his objection to testimony concerning the judgment in Murphy v. Cartwright in the Federal Court is without merit because other witnesses testified to substantially the same facts without objection. Admitting testimony which was cumulative of testimony to the same effect tendered by other witnesses to which no objection is made is not error. Steinke v. Schmid, Tex.Civ.App., 223 S.W.2d 955.

■ We can see no merit in appellant's point that the trial court erred in overruling his objection to the testimony concerning meetings and discussion between appellant and Mrs. Murphy. Portions of Mrs. Murphy's deposition were introduced by appellee. She testified that appellant came to see her on May 1, 1950, about signing a paper and told her they had some lots in Alpine and could not make title to them. He told her she would get her part if she would sign the paper. She then testified about filing a suit against the appellant and finally making a settlement. Appellant had already testified, without objection, that he

obtained a deed from Mrs. Murphy. Appellant had already testified, without objection, that he made a settlement with Mrs. Murphy by giving her 650 acres of land in Baylor County. He had also testified, without objection, that he made exactly the same representations to Mrs. Murphy as he did to Mrs. Minton and Mrs. Flesher. The case of Steinke v. Schmid, 223 S.W.2d 955 would be sufficient authority for overruling this point, but, in our opinion, there are other good and sufficient reasons for overruling this point, namely concealment on the part of appellant and securing the signatures of appellees to the quitclaim deeds by deception. Appellees' pleadings justified, and they tried this case on the theory that appellant had concealed material facts from them and had failed to make a fair and complete disclosure to them of the contents of the deeds, as well as the condition of the estate. We think the applicable law is clearly stated in 20-A Tex.Jur. 93, 94, as follows: "And the cases in defining fraudulent concealment frequently include the terms 'knowledge' and 'intent'. Indeed the word 'concealment' implies a suppression of that which is known. Likewise knowledge and intent are always present when one's signature to a paper or document is obtained by artifice, deception or trick." See also, Compagnie Des Metaux Unital v. Victoria Mfg. Co., Tex.Civ.App., 107 S.W. 651.

■ It would unduly prolong this opinion to quote or even narrate the argument of appellees which appellant objected to and contends constitutes reversible error. "Before a judgment is reversed because of argument of counsel two things must appear: the argument must be improper, and it must be such as to satisfy the reviewing court that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case." Aultman v. Dallas Ry. & Ter. Co., 152 Tex. 509, 260 S.W.2d 596, 599. We have carefully considered all of the argument. Some of the argument could be considered in reply to appellant's argument. In any event, we do not think the nature of the argument was

such as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

We have considered all of appellant's points and find no merit in them and they are accordingly overruled. The judgment of the trial court is affirmed.