**Grady TUCK, Jr., Appellant,**

v.

**Geraldine MILLER et al., Appellees.**

No. 11889.

Court of Civil Appeals of Texas, Austin.

Aug. 9, 1972.

Rehearing Denied Aug. 30, 1972.

Vickery & McConnell, Charles R. Vickery, Jr., Don Stocking, Houston, for appellant.

McGinnis, Lochridge & Kilgore, Peter M. Lowry, Austin, for appellees.

O'QUINN, Justice.

Geraldine Miller, one of the appellees, brought this suit against Grady Tuck, Jr., the appellant, seeking to impress an equitable trust upon a 170-acre farm in Bastrop County, and alternatively for damages, based upon Tuck's refusal to perform under an oral agreement concerning the land.

The jury found that a confidential relationship existed between Geraldine Miller and Tuck prior to her conveyance of the farm to Tuck and that the land was deeded to Tuck pursuant to an agreement that he would take title for the purpose of obtaining a loan on the land and in order to secure Tuck for his expenses and services in effecting the loan. Upon these findings and others, all favorable to Geraldine Miller, the trial court entered judgment to impress the land with a trust for the purpose of enforcing the agreement as found by the jury.

Tuck has appealed and brings ten points of error. We will overrule all points of error and affirm the judgment of the trial court.

Geraldine Miller sued Grady Tuck, Jr., Robert C. Caldwell, her former husband, and Gonzales Savings and Loan Association. Charles N. Allred later brought suit against Tuck and Geraldine Miller and joined Gonzales Savings and Loan. The two suits were consolidated in the trial court and tried as one cause. On appeal Tuck is appellant and the other parties are appellees, except Caldwell who made no appearance below.

In November of 1964 Geraldine Miller and Robert Caldwell, from whom she was divorced late in 1968, prior to the filing of this lawsuit, entered into a contract to purchase as her separate property the 170-acre farm, which is the subject of this suit, from D. F. Kauffman, Jr. and his wife. Under the contract the purchase price was $25,500 with a down payment of $2,500 made by Geraldine Miller, and the balance was to be paid in monthly installments of $250 including interest at six percent. The land was encumbered at the time by a debt of $9,000, and payments initially were made through the First National Bank in Bastrop.

The Caldwells thereafter purchased a house in Austin from Charles N. Allred for $2,500 and moved the structure from Austin to the farm. The Caldwells paid Allred $500 in cash and agreed to pay the balance of $2,000 at the rate of $250 "every two or three months."

During 1965, 1966 and most of 1967 the Caldwells kept up the payments to the Kauffmans, in all paying about $6,000, in addition to the down payment of $2,500. Early in 1968 the Caldwells began to falter in their payments, and when a check in March of 1968 was returned by the bank, the Kauffmans consulted their attorney who advised the Caldwells by letter that the balance of about $18,000 and current taxes of $44.10 would be required of them in thirty days. The Caldwells failed in an attempt to refinance their debt and entered into a period of trying to arrange for an extension with the Kauffmans. The Caldwells made at least two deposits of $250 in

a Bastrop bank to the credit of the Kauffmans, but late in July of 1968 Geraldine Miller learned, in a telephone conversation with the Kauffmans' attorney, that the farm had been sold to Charles N. Allred. Later the two deposits of $250 each the Caldwells had made were returned to them.

While falling behind in their payments to the Kauffmans, the Caldwells had ceased also in 1968 to pay Allred on the house moved from Austin, with a balance by June of $1,250 still owing to Allred. When Allred called Caldwell by telephone requesting payment on the debt, Caldwell became profane and abusive and "hung up the phone." Allred consulted his attorney in Austin and also asked a friend who was a real estate broker to look at the Kauffman farm and to ascertain how much the Caldwells still owed on the place. The real estate broker advised Allred that in his opinion the place had a market value of approximately $50,000 and that the Caldwells owed about $18,000 plus current taxes.

Allred testified that he decided to buy the Kauffman farm because the Caldwells still owed him on the house and that by owning the farm he would recover the house. Through his attorney and the real estate broker, Allred succeeded in buying the farm from the Kauffmans for $18,153.-81.

When Geraldine Miller learned from the Kauffmans' attorney that the place had been sold, she and Caldwell, she testified later, were "in a state of shock," largely because they believed the Kauffmans had agreed to delay termination of their contract to purchase. The Caldwells were still living on the farm, and Caldwell went at once to a nearby store on the highway hoping to find Kauffman and "see what's going on."

It was at the store, known locally as Hills Prairie Grocery or Sanders Grocery, that Grady Tuck, Jr., the appellant, first entered into the pastoral which found its denouement in the courthouse. Caldwell did not find Kauffman at the store as he had hoped, but did see Tuck, owner of a neighboring farm, who was already at the store. Tuck and Caldwell had known each other about three years, since the time the Allred house was moved to the Caldwell place from Austin, and the two men on occasions drank beer together at the grocery store.

Tuck testified that Caldwell told him that ". . . Kauffman had slipped around . . . and sold his place to Mr. Allred because Mr. Allred wanted to collect . . . for his house . . . and . . . that he [Caldwell] was in this situation, he had about ten days to dig up about $18,000.00."

Bryan Sanders, who operated the store at Hills Prairie, was present when Caldwell and Tuck had their conversation in the store in July of 1968. Sanders testified that Caldwell "was disturbed about some of his business on the place he had" and said "they had foreclosed on him and he needed some money, he had to rake up some money pretty quick, he said." Sanders heard Caldwell ask Tuck, "Is there any way that you can help me?" and heard Tuck reply, "Well, I don't know whether I can or not."

After talking "at the table for awhile," both Caldwell and Tuck left the store. The next scene unfolded at the Caldwell farmhouse, with Tuck, Caldwell, Geraldine Miller, and her mother, Mrs. Wheat Miller, present and participating.

Caldwell arrived at the house first, followed very shortly by Tuck. At the trial Geraldine Miller testified that when Caldwell arrived he told her that Tuck was "coming up here in a minute to talk to us about" the problem of saving the place. Both Mrs. Wheat Miller and Geraldine Miller testified that when Tuck arrived he referred to what he had heard at the store and wanted more details. Geraldine Miller testified that they told Tuck that the farm had been sold without their knowledge after they had put money in the

bank under an agreement with the Kauff-mans and that "we just didn't know what we were going to do."

Geraldine Miller quoted Tuck as saying, "Well, why—if you were getting behind any or if you were having problems finan-cially or if you wanted to refinance it, why didn't you come to me? What are friends for if they can't help you? Maybe being in the business of buying and selling land and financing land, I think I can help you."

While the group sat in the Caldwell kitchen talking, according to Geraldine Miller, "Grady started thinking, you know, 'Well, what can we do? We'd rather not go into a lawsuit over this thing,' which we wanted to prevent, 'but is there some way to where we can work it out where we could get Mr. Allred to convey the proper-ty back?' And, if we could, then Grady felt he could help us to secure a loan and give us a chance to either finance it through somebody else or maybe Gonzales [Savings and Loan] would finance it to us, or if we didn't get it refinanced, then we would sell it."

Mrs. Wheat Miller, who had known Allred many years as a friend, was picked to talk to Allred. Mrs. Miller left at once and drove to Allred's farm near Austin to talk to him. Allred testified that he was operating a tractor when he saw Mrs. Mill-er drive through his gate. Allred stated, "She drove down there and I got off the tractor and walked over there to her, and she . . . said, 'Charles, Sister's awful upset and I just wonder if you'll do some-thing for me.' And I said, 'What's that?' She said, 'She wants that home.'"

Allred then replied, "Bob Caldwell, he's no good, and how can she pay for it?" Mrs. Miller said, "Well, she's got a dear friend that's going to help her pay for it, her and Bob." Allred protested to Mrs. Miller that he did not want "somebody else" to have the place, but that he would agree to her request if Mrs. Miller's daughter was to get the place back and if

Allred could recover the money for his house and for expenses incurred.

Mrs. Wheat Miller returned to the Cald-well farm and reported her conversation with Allred. It was decided then that Tuck and Caldwell would go the following week to Gonzales Savings and Loan to in-quire about obtaining a loan. Gonzales agreed to make the loan, but not to Cald-well. To secure a clear lien on the farm, it became necessary for Allred to execute a deed to Tuck, in whose name the loan was to be made. Allred received $20,886.93 which reimbursed him for the price he had paid the Kauffmans and for his house and expenses incurred. Allred testified that he intended to help Geraldine Miller to get the farm back and that he would not have conveyed the place to Tuck, whom he did not know, at a price far below the farm's market value. Allred's attorney, Donald Thomas of Austin, declined to proceed with writing a deed from Allred to Tuck until he was assured by Mrs. Wheat Miller that the whole transaction was for Geral-dine Miller's benefit. Allred had told Thomas, when asked why Allred was "let-ting them have it back," that he would feel hurt if he kept the place under the circum-stances, although he knew the farm was worth "lots more than that" and all he wanted to do was get his money back.

Thomas changed Allred's deed from one with a general warranty to a conveyance under special warranty. Gonzales then re-quired the Caldwells to execute an addi-tional deed, containing a general warranty, in favor of Tuck. Geraldine Miller Cald-well testified that at the time she signed the deed it was her understanding that the deed was required "so that Gonzales Sav-ings and Loan would have a clear, clean ti-tle so they could issue the money on the loan." She said her agreement with Tuck was that the deed to him "was simply to secure a loan and nothing more, and then he was to convey the title back as soon as we could make other arrangements." The other arrangements, she explained, were that the Caldwells were to refinance so

Tuck could get his money back, or the place would be sold and Tuck would be paid a commission and his expenses. The agreement was to extend "a full year from the time that the loan was made."

In answering Special Issue No. 1, the jury found that "at the time the land . . . was deeded to Tuck, he and Geraldine Miller agreed that he was to take title to the land in order to obtain the loan . . . and to secure him for his expenses and services . . . [Gerald Miller] would have the right until August 30, 1969 . . . to take title to the land in her own name by refinancing the loan and paying . . . Tuck, or to sell the land and pay off . . . Tuck and the loan association." The trial court instructed the jury that the term "services" meant services performed and to be performed by . . . Tuck for which [Geraldine Miller] . . . was to pay him . . . $1,000 if the property was refinanced or . . . 6% commission if the property was sold . . . ."

About four months after the loan transaction, Tuck caused his attorney, on January 20, 1969, to advise Geraldine Miller by letter that Tuck had instituted eviction proceedings against her. Geraldine Miller's divorce from Bob Caldwell was effected by judgment entered late in December of 1968. Tuck's position in the trial of the case was that the deeds from Allred and the Caldwells conveyed absolute title in the farm to Tuck, but that he did have a "loose-end deal" with the Caldwells to pay them $6,000 for their equity. Prior to making the loan, Gonzales Savings and Loan appraised the farm at $38,500. The real estate broker whom Allred asked to look at the farm believed the place had a market value close to $50,000. Under the arrangement involving Tuck, the Caldwells, Allred and Gonzales, the loan was limited to an amount needed to pay Allred, less than $21,000.

Tuck contends on appeal that the finding by the jury that a confidential relationship existed between Tuck and Geraldine Miller is rendered pointless because the rule of Tolle v. Sawtelle, 246 S.W.2d 916 (Tex.Civ.App. Eastland 1952, writ ref.), "condemns as unenforceable" the agreement the jury found to exist between Tuck and Geraldine Miller.

In Tolle v. Sawtelle suit was brought in trespass to try title. The court of civil appeals stated, "Before appellee could recover in a suit of trespass to try title, she must show that she has the superior title to the land. Under the agreement she was not to have title to the property until she had taken care of her mother as long as the mother lived and paid all of the loan. Her mother is still living and there are still payments to be made upon the purchase money loan. It will thus be seen she failed to discharge the burden imposed upon her." (246 S.W.2d 920)

The court reversed the judgment of the trial court and remanded the cause, saying, "Appellee cannot recover upon the theory of a constructive or resulting trust. The case was tried upon the wrong theory . . . ." Recovery on the theory of constructive or resulting trust was denied, the cause having been brought and tried on the theory of trespass to try title. Similar action was taken by the Supreme Court in Morrison v. Farmer, 147 Tex. 122, 213 S.W.2d 813, 815 (1948), and Morrow v. Shotwell, 477 S.W.2d 538, 541 (Tex.Sup.1972), because the suit was tried on a wrong theory and justice of the case demanded another trial.

This suit by Geraldine Miller was brought and tried on the theory of an equitable trust impressed upon the land for the benefit of the plaintiff. The relevant allegations are repeated in pertinent part:

"Defendant Tuck is now claiming that he is not required to honor the agreement which he made and represented he would perform at the time he induced plaintiff to secure the deed to the farm from Allred to him, because such agreement was not in writing. Plaintiff alleges that . . .

Tuck at the time he made the . . . representations and propositions did not intend to perform the same, but intended to deny them and end up with title to the farm at a price far below its fair cash market value. Plaintiff further alleges that at all times prior to his repudiation . . . Tuck occupied a fiduciary relationship to plaintiff, based upon trust and confidence reposed in him by plaintiff and the agency established. By such false promise, plaintiff was induced to prevail upon . . Allred to convey the farm to . . . Tuck and but for such false and fraudulent inducement plaintiff would not have secured conveyance of the farm to . . . Tuck. Defendant Tuck holds legal title to the title [land] in trust for the use and benefit of plaintiff . . ."

The overwhelming weight and preponderance of the evidence supports the finding of the jury under Special Issue No. 1 that Tuck and Geraldine Miller agreed that Tuck was to take legal title to the land to obtain the loan and to secure Tuck for his expenses and services and that Geraldine Miller would have the right until August 30, 1969, either to take title by refinancing the loan and paying Tuck, or to sell the farm and pay Tuck and the loan association. Tuck contends that the parol agreement is unenforceable on any theory of trust because of the holding in Tolle v. Sawtelle, *supra*, and because the jury's finding that a confidential relationship existed between Tuck and Geraldine Miller is not supported by the evidence. We reject these contentions and overrule the points of error under which these arguments are advanced.

Tuck relies on Scott's treatise on trusts and three Texas cases for the proposition that the Statute of Frauds prevents the enforcement of an express trust or contract when the promise or agreement is oral. (1 Scott on Trusts, 351, sec. 45) Tuck contends that aligned with this view, which Scott states "is the view taken by most of the American courts," are Tolle v. Sawtelle, supra; Morrison v. Farmer, supra,

and Michael v. Busby, 139 Tex. 278, 162 S.W.2d 662 (1942).

We have pointed out that *Tolle* and *Morrison* are not controlling under the facts of this case. Michael v. Busby is not in point and not controlling because, as stated by the Supreme Court in that case, "We are unable to see how a trust in favor of Mrs. Busby could have resulted from the contract between her and Louis M. Michael. Under the plain terms of the contract, Michael was to become the purchaser of this land by taking title thereto. *It was not agreed, either directly or by implication, that such title was to be taken in Michael's name for Mrs. Busby.* To the contrary, it was agreed that Michael would convey the land to Mrs. Busby for a consideration fully defined." (Emphasis added) (162 S.W.2d 665)

The Supreme Court dealt with the rule stated by Scott in Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401, 406 (1960), but there quoted also from Scott in stating, "There are numerous cases to the effect that where at the time of the transfer the transferee was in a confidential relation to the transferor, and the transferor relied upon his oral promise to reconvey the land, he is chargeable as constructive trustee of the land for the transferor." (1 Scott on Trusts 253, sec. 44.2)

Tuck brings a point of error under which it is argued that because there was no agreement between Tuck and Allred, the confidential relationship, if there was one, between Tuck and Geraldine Miller will not give rise to a constructive trust in favor of Geraldine Miller. Tuck cites Restatement of Restitution, section 183, and Restatement of Trusts, section 45, in support of this contention. These sections are limited to transfers "where the owner of an interest in land transfers it *inter vivos* to another upon an oral trust in favor of a third person or upon an oral agreement to convey the land to a third person . . ."

Section 194 of the Restatement of Restitution is applicable to the facts of this

case, in which "one person orally undertakes to purchase land *on behalf of another*." (Emphasis added) In such cases a constructive trust may be enforced based upon the violation of a fiduciary duty. The applicable portion of the comment under Section 194 was quoted by the Supreme Court in Omohundro v. Matthews, *supra*, 341 S.W.2d 401, at page 407. Moreover, in this case Tuck took a deed from the Caldwells, with a general warranty, in addition to the special warranty deed from Allred.

Under the rule stated in Omohundro v. Matthews, the presence of a parol agreement as to the title to property will not prohibit the imposition of a constructive trust, and the courts, in declaring the trust, "will not be enforcing an oral contract but will be enforcing a constructive trust based upon the violation of a fiduciary duty and to prevent unjust enrichment." (341 S.W.2d 405)

Tuck takes the position that there was no confidential relationship between him and Geraldine Miller and her husband. Tuck testified that he had known Geraldine Miller for fifteen years, beginning when he lived in Austin and before either of them moved to Bastrop County. Geraldine Miller corroborated this testimony and said that although they were not "real close, close friends," they had been "socially in the same crowds many times." Tuck said that after he met Bob Caldwell in Bastrop County, they got to be friendly and drank beer together occasionally, adding, "It seemed like he was out of town a lot, and we had neighboring farms there and naturally it was a neighborly association." Tuck who had been in the real estate business for twenty-four years, handling approximately 150 separate land deals in Bastrop County, knew that Caldwell and his wife were "having financial problems with Kauffman . . . that was pretty common knowledge. They were having a hard time meeting these monthly payments." This knowledge enabled Tuck to know the "situation" before his encounter with Caldwell at the grocery store that led to the agreement to help the Caldwells recover the farm.

Tuck's approach to Geraldine Miller, at the Caldwell home, was that on the basis of friendship and his experience "in the business of buying and selling land and financing land" he thought he could help the Caldwells. Geraldine Miller quoted Tuck as saying that if they "were getting behind any or . . . having problems financially or . . . wanted to refinance it," why didn't the Caldwells come to him? "What are friends for if they can't help you?", Tuck said, according to both Geraldine Miller and her mother, Mrs. Wheat Miller.

In protesting that his friendship with Geraldine Miller was not sufficiently close to create a confidential relationship separate and apart from and prior to the transaction forming the basis of this lawsuit, Tuck now seeks to disavow his assertions at the Caldwell home of the kind of friendship and the kind of superior business skill that existed before their agreement and the kind he chided the Caldwells at that time for not availing themselves of in their time of need.

It is settled that in cases of this nature it is a question of fact as to whether a confidential relationship existed as a predicate for the imposition of a constructive trust and that whether facts existed which would create a confidential relationship is for the jury to decide. MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334 (1944); Schiller v. Elick, 150 Tex. 363, 240 S.W.2d 997 (1951).

The jury in answering Special Issue No. 2 found that prior to the conveyances of the farm to Tuck there existed a confidential relationship between Tuck and Geraldine Miller. The trial court instructed the jury that by confidential relationship ". . . is meant every form of relationship between parties wherein confidence and special trust is reposed by one in another and he or she is justified in plac-

ing such trust and confidence in such other party, and relies upon such other party to protect his or her interest."

The definition by which the trial court instructed the jury fairly and accurately applied to the circumstances of this case and to the relationship concerning which the several witnesses testified. No definition as a practical matter can be devised that is comprehensive enough to cover all cases, but in general a confidential or fiduciary relationship "contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction" under consideration. Cartwright v. Minton, 318 S.W.2d 449 (Tex.Civ.App. Eastland 1958, writ ref. n.r.e.), cited with approval in Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, 561 (1962). The term includes "informal relationships, such as moral, social, domestic, or merely personal ones, where one person trusts in and relies upon another . . ." Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256, 261 (1951); Holland v. Lesesne, 350 S.W.2d 859 (Tex. Civ.App. San Antonio 1961, writ ref. n. r. e).

Although the Supreme Court declined to impose a constructive trust under the facts in Thigpen v. Locke, 363 S.W.2d 247 (Tex.Sup.1963), the Court stated, "Our holding in no way detracts from the principle that a relationship of trust and confidence may be shown to arise informally from purely personal relationships." (363 S.W.2d 253) The confidential relation may exist also when "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on the one side, or weakness, dependence or justifiable trust, on the other." Locke v. Thigpen, 353 S. W.2d 249, 255 (Tex.Civ.App. Houston, 1962) rev. on other grounds, 363 S.W.2d 247 (Tex.Sup.1962).

Tuck urges error of the trial court in refusing to give the additional instruc-

tions that the confidential relationship must arise before, and apart from, the agreement, and that because persons have had prior dealings with each other and one person subjectively trusts the other will not establish a confidential relationship. The requested instructions are derived from decisions in which the courts stated rules to be applied in determining whether the evidence in those cases warranted a finding of confidential relationship. The trial court did not abuse its discretion in refusing to incorporate the stated rules in its instruction to the jury.

Under the fifth point of error Tuck contends that the agreement between Tuck and Geraldine Miller was merged in the deed to Tuck. In this position Tuck relies on Commercial Bank, Unincorporated of Mason v. Satterwhite, 413 S.W.2d 905 (Tex.Sup.1967). The grantor in that case did not assert that the deed failed to express the agreement of the parties because of fraud, accident or mistake, and no equitable relief was sought. (413 S.W.2d 905) The doctrine of merger by deed is not applicable to the facts of this case. Faville v. Robinson, 111 Tex. 48, 227 S.W. 938 (1921); Mills v. Gray, 147 Tex. 33, 210 S. W.2d 985, 988 (1948).

Tuck urges under his sixth point that Geraldine Miller is estopped by her deed from relying on the oral agreement with Tuck. In the main Tuck relies on the decision in Duhig v. Peavy-Moore Lumber Co., 135 Tex. 503, 144 S.W.2d 878 (1940). There the Supreme Court construed a deed in which the grantor sought to reserve an interest in the minerals in a paragraph appearing after the general warranty and after the habendum clause. The Court said, ". . . the language of the deed as a whole does not clearly and plainly disclose the intention of the parties that there be reserved to the grantor . . . an undivided one-half interest in the minerals in addition to that previously reserved to Gilmer's estate . . ." (144 S.W.2d 879) *Duhig* and the other cases Tuck relies on

in urging estoppel by deed are not authority for defeating the enforcement of a constructive trust in cases in which the *cestui que trust* has made and given a deed.

Tuck contends under points seven and eight that the trial court erred in impressing a resulting trust on the farm and in refusing certain requested special issues dealing with the question of whether the deeds were intended as mortgages. Geraldine Miller's position on appeal is that the judgment of the trial court is supported by any of three theories, none of which requires the agreement to be in writing. Appellee Miller urges that the judgment is supported, not only under the theory of constructive trust, but the theory of resulting trust and the theory that the deeds to Tuck constituted a mortgage transaction. Tuck insists that because no special issues were submitted on resulting trust, that theory has been waived by Geraldine Miller, and for the same reason the mortgage theory has been waived.

In view of our holding that the judgment is supported under the findings of the jury on the theory of constructive trust, we deem it unnecessary to discuss or decide other theories of the case.

Under his ninth point of error Tuck urges error of the trial court in enforcing the agreement found by the jury under Special Issue No. 1 because Geraldine Miller did not exercise her option under the agreement by August 30, 1969. It is clear from the record that Tuck sought to oust Geraldine Miller from possession of the farm and to repudiate whatever agreement they had within a few months following the transactions involving the loan and long prior to the time when Geraldine Miller could have exercised her option to refinance or to sell the place and, in either event, to pay Tuck for his expenses and services. The point is overruled.

Tuck's tenth and final point is that the trial court erred in awarding possession to Geraldine Miller. The record

shows that Geraldine Miller was living on the farm at the time of her agreement with Tuck and continued to live on the farm after the agreement. Geraldine Miller's testimony that it was agreed she was to retain possession is undisputed. Whatever claim Tuck makes to possession under the deeds is nullified by the trial court's judgment impressing the land with a constructive trust in favor of Appellee Miller. We decline to give further consideration to this ground of error, as we do not find it set forth distinctly in the motion for new trial. Rule 374, Texas Rules of Civil Procedure.

We have carefully examined and considered all points of error and now overrule them. The judgment of the trial court is in all things affirmed.

Affirmed.