**Larry D. HARRIS, Plaintiff,**

v.

**SENTRY TITLE COMPANY, INC., et al., Defendants-Appellants,**

v.

**Travis WARD, Defendant-Appellee.**

**No. 82–1108.**

United States Court of Appeals, Fifth Circuit.

Sept. 26, 1983.

Rehearing and Rehearing En Banc Denied Oct. 26, 1983.

Vetter, Bates, Tibbals, Lee & DeBusk, J. Albert Kroemer, J. Michael Tibbals, Dallas, Tex., for defendants-appellants.

Rohde, Chapman, Ford & How, Michael E. Rohde, Lawrence McDonald Wells, Dallas, Tex., for Ward.

Before WILLIAMS and JOLLY, Circuit Judges, and WILL *, District Judge.

JERRE S. WILLIAMS, Circuit Judge:

This appeal is an interpleader action to determine the proper distribution of proceeds from a foreclosure sale of real property in Henderson County, Texas. The case was moved from state to federal court when the IRS asserted a claim against the proceeds, 28 U.S.C. §§ 1340, 1345, and remained there after the IRS achieved satisfaction of its claims. The district court imposed a constructive trust on the proceeds in favor of defendant-appellee Travis Ward and awarded the majority of the funds to Ward, rather than to defendant-appellant Sentry Title Company or its controlling shareholder, Alan Whatley. We find that the facts do not support the imposition of a constructive trust under Texas law and reverse the district court.

## I. Facts

Travis Ward is a successful business and oil man in Athens, Texas. In early 1970, Ward was interested in acquiring a 490 acre tract near Cedar Creek Lake in Henderson County, Texas. The owner of the property was the Tarrant County, Texas, Water Control Board. Fearing that the price would go up if he used his own name, Ward did not want to bid for the property personally. He therefore approached Alan Whatley, a local businessman who knew some members of the Water Board. Ward met in early 1970 with Whatley and Bill Hart, Whatley's attorney. Whatley and Hart agreed to help Ward submit a bid for the 490 acres. In return, Hart was to receive $30,000 to $35,000 if Ward acquired the 490 acres through

---

* District Judge of the Northern District of Illinois, sitting by designation.

these efforts. Whatley's compensation for acting on behalf of Ward was that he would receive Ward's aid in financing the purchase of a 16 acre tract in Athens, Texas. Whatley had a contract to purchase the Athens tract for approximately $80,000. Ward agreed to provide Whatley with $20,800 as a down payment on the property, which the parties agreed would be held jointly by Whatley and Ward.

Ward obtained the $20,800 through the State National Bank of Corsicana, Texas, in which Ward was the majority stockholder and a bank officer. The loan was made in Whatley's name, although Ward paid the note off out of his own funds. The district court found that this note was made in Whatley's name only because the lending officer objected to making a loan in the name of a bank officer.

On July 6, 1970, after several discussions of strategy, Hart made a bid to purchase the 490 acres from the Water Board for $480,000. The district court found this bid was made on behalf of Ward. Three other bids were made on that same date. A bid of $511,000 was submitted by Ward himself through one of his holding companies, Pan American Properties, Inc. Another bid of $771,750 was submitted by Home Engineering, Inc., a company controlled by Whatley. The district court found that this bid also was made on behalf of Ward. Finally, Spanish Shores, a company unrelated to the Ward endeavors, submitted a bid for $748,230. According to the facts as found by the district court, the Ward parties had hoped that one of their bids would be the high bid, and that any of their unnecessarily high bids could be withdrawn and still allow a Ward-related bid to win the 490 acres.

The Water Board made an initial determination that the Spanish Shores bid, although seemingly lower than the Home Engineering bid, was in fact the highest bid.[1] Ward took the two highest bids to an independent bank for analysis, in an attempt to show the Water Board that the $771,750 Home Engineering bid was in fact higher than the $748,230 bid. The Water Board planned to resolve the issue on July 28.

Between July 6 and 28, Ward met twice with Whatley and Hart. They decided upon additional steps that might help Ward to emerge the victor in the bid for the 490 acres. One plan involved the Dyckman tract, a property that abutted the 490 acres and possessed an easement over that land. Whatley and Hart had tried before to acquire this property. Ward advanced Hart $600 for expenses, and Hart entered into a contract to purchase the Dyckman property for $30,500. The Dyckman property was sold on about July 24 to Home Engineering, a company controlled by Whatley. The sales price was met with a $5,000 down payment that Ward apparently furnished himself, plus a promissory note for $25,500 given to the seller. The proceeds from a later sale of the Dyckman property are the subject of this appeal.

Another leg to the July strategic maneuvers was the acquisition of the Lacy lawsuit. Jack and Pauline Lacy had owned a piece of the 490 acre tract and sold it to the Water Board. Disputes later developed, and the Lacys were contemplating suit against the Water Board. Ward believed that if he held the right to pursue the Lacy suit, his chances of winning the 490 acres would be increased. Whatley acquired the rights to pursue the Lacy suit, with the assistance of Ward's attorney, Willis Moore.

When the Water Board met on July 29, 1970, it voted to reject all bids for the 490 acres and initiate new bidding with an October 15, 1971, date. This second round produced two bids, one by Sentry Title Company, Inc., a company controlled by Whatley, and the other by an unrelated company. These bids again were rejected by the Water Board, and a third round of bids took place in February of 1972. Ward did not bid in this final round because he felt the price of the 490 acres had gotten too high for him. Sentry Title, one of

---

1. At first glance, $771,750 is larger than $748,230. However, the conditions of the bid, including the timing of payments could make a higher dollar bid inferior to a lower but less complicated offer. For example, $10,000 today is worth more than $10,500 a year from now, at current interest rates.

Whatley's companies, submitted a bid on behalf of Whatley, not on behalf of Ward, that won the property for $807,256.

Ward has not asserted any ownership interest in the 490 acres since he dropped out of the bidding. Nor has he pursued the other related projects that grew out of the overall scheme to buy the 490 acres, such as the Lacy lawsuit or the Athens property that Ward helped Whatley to acquire. However, Ward has asserted an equitable interest in the Dyckman property that Whatley bought in July, 1970.

The status of the Dyckman tract had changed several times after Home Engineering bought it in July of 1970. First, title was transferred from Home Engineering to Sentry Title in 1972; Sentry was also controlled by Whatley at that time. Home apparently financed a second mortgage on the property to enable Sentry to buy it. The first mortgage on the property continued, but the holder of the lien, the original owner, sold the note to Bob John Robinson. When Whatley's companies fell into financial distress and defaulted on the note, Robinson called for a foreclosure sale. The property was sold at the foreclosure sale to Travis Ward for $250,000.[2]

Ward brought this interpleader action to assert a claim to the proceeds remaining from the Dyckman tract foreclosure sale.[3] Ward claimed, inter alia, that Whatley initially bought the property as Ward's agent, and that Ward therefore was entitled to any proceeds remaining after various creditors are paid. No claims were made against Whatley personally or against Whatley's other real estate holdings. The suit was filed initially in state court, but the IRS soon joined the action to assert a tax claim, and the case was removed to federal district court, 28 U.S.C. §§ 1340, 1345. When the IRS finally received satisfaction of its claims, the district court found it would be in the interest of justice to allow the case to remain in federal court rather than delay

the litigation further by a remand to state court. We find no abuse of discretion in this ruling.

The district court found that any oral partnership arrangement that might have existed among Ward, Whatley, and Hart would be unenforceable vis-a-vis the Dyckman tract under the Statute of Frauds. It similarly determined that Texas trust law would not recognize most fiduciary relationships asserted as existing between Ward and Whatley in the absence of a written agreement. However, the court did find that the facts of the case supported the imposition of a constructive trust on the transaction.

■ A constructive trust is an equitable remedy that can be imposed on parties whose course of conduct over a long, preexisting period suggests that a relationship of confidence and trust was assumed by the parties to the subject action. The importance of a constructive trust in this case, of course, is the fact that such trusts, although involving real property, are not subject to the statute of frauds. The district court, after providing for the payoff of certain recorded liens, judgments, and attorneys fees, awarded the bulk of the $250,000 proceeds of the Dyckman tract to Ward by imposing a constructive trust upon the proceeds.

Whatley brings this timely appeal, asking us to overturn the imposition of a constructive trust.

## II. Constructive Trusts—Generally

■ The controlling law is that of Texas. Under Texas law, a contract to convey real property normally is subject to the statute of frauds and requires a writing in order to be enforceable. Tex.Bus. & Com. Code Ann. § 26.01 (Vernon 1968). Similarly, the creation of most trusts requires a written instrument to be effective. Texas Trust Act, Tex.Rev.Civ.Stat.Ann. art. 7425b–1 et seq. (Vernon 1960). Certain

---

**2.** Ward's ultimate ownership of the Dyckman tract is unrelated to the case before us in which Ward lays claim to the proceeds of the foreclosure sale.

**3.** Some claims, including certain trustee's expenses and claims of the IRS, either have been paid from this interpleader fund already or are stipulated to be superior to Ward's claim that we examine today.

trusts, though, can be imposed as an equitable judicial remedy without a formal writing. These are recognized as constructive trusts.

A constructive trust is an equitable tool in a court's power that can infer a fiduciary-like relationship within a transaction for the purpose of promoting justice. *Gordy v. Alexander,* 550 S.W.2d 146 (Tex.Civ. App.—Amarillo 1977, writ ref'd n.r.e.). "Resort is had to it in order that a statute enacted for the purpose of preventing fraud [, the statute of frauds,] may not be used as an instrument for perpetrating or protecting a fraud." *Pope v. Garrett,* 147 Tex. 18, 23, 211 S.W.2d 559, 561 (1948).

In recognizing a constructive trust, the critical requirement for purposes of this case is that the parties have a confidential or fiduciary relationship prior to and apart from the transaction in question. *Rankin v. Naftalis,* 557 S.W.2d 940 (Tex. 1977); *Karnei v. Davis,* 409 S.W.2d 439 (Tex.Civ.App.—Corpus Christi 1966, no writ). This relationship may be established through prior joint business ventures, *e.g. Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557 (1962), family relationships, *Mills v. Gray,* 147 Tex. 33, 210 S.W.2d 985 (Tex.1948); *Ellisor v. Ellisor,* 630 S.W.2d 746 (Tex.App.—Houston [1st Dist.] 1982, no writ), or other types of close, confidence-inducing relationships. It need not arise from a strict, formal fiduciary relationship. *Meadows v. Bierschwale,* 516 S.W.2d 125, 128 (Tex.1974); *Holland v. Lesesne,* 350 S.W.2d 859 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). However, mere subjective confidence among business associates or the like is insufficient to support a constructive trust. *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966).

The distinction between an actual trust and a constructive trust is critical. An actual trust is established by the express will of the parties, while a constructive trust is an equitable remedy based on the court's interest in preventing unjust enrichment rather than on any legally-enforceable fiduciary relationships. A constructive trust is actually not a fiduciary relationship at all but rather an equitable duty. As explained in the Restatement of Restitution § 160, adopted by the Supreme Court of Texas in *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951), a constructive trust arises when "a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." It is imposed without regard to, and even despite, the intentions of the parties.

A constructive trust must also be distinguished from a resulting trust. A resulting trust is an actual, binding trust that can develop where the parties intended a confidential or fiduciary relationship to develop and acted accordingly, but failed to create a valid actual trust agreement. A resulting trust can occur, for example, where one party buys real property with the funds of another with the understanding that the property is being held for the party that provided the money. The resulting trust analysis does not apply to this case, however, because it requires evidence of a shared intent to establish a strict fiduciary relationship. No shared intent to establish such a relationship is claimed in this case. The issue of resulting trust is not raised by any party.

The doctrine of constructive trust cuts through the requirements of the statute of frauds or the parol evidence rule that otherwise could prevent recovery in a case. *Palmer v. Fuqua,* 641 F.2d 1146, 1155 (5th Cir.1981). Yet, since this is an equitable remedy rather than a legal instrument there is no "unyielding formula" for determining whether a constructive trust exists on the facts of a particular case. *Meadows v. Bierschwale,* 516 S.W.2d 125, 131 (Tex. 1974). Prior Texas cases, however, serve as important guideposts in analyzing the principal factors.

In *Consolidated Gas & Equip. Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966), the Supreme Court of Texas found that the dealings between the parties failed to establish a constructive trust but showed at most either an oral contract to convey real

property or an oral trust, neither of which was enforceable under the Texas Statute of Frauds or the Texas Trust Act. The case involved attempts to secure drilling rights to certain Texas oil and gas properties. The Griffiths made an agreement that they would receive a ¹⁄₁₆th overriding royalty from Consolidated Gas if they obtained the needed land. The Griffiths, finding that they could not secure the property in time, enlisted the aid of H.M. Thompson. They evidently promised Thompson ⅓ of their ¹⁄₁₆th interest. However, when Thompson obtained the rights directly for Consolidated Gas, Consolidated Gas refused to recognize any obligation to the Griffiths. The agreement between Consolidated Gas and the Griffiths was entirely oral. The Griffiths sued on a theory of constructive trust.

The Supreme Court of Texas held that no constructive trust was created under Texas law. There had been prior business dealings and the payment of finders fees between Consolidated Gas and the Griffiths. However, the court found the nature of these contracts to be sporatic. They did not meet a requirement of dealings "over a long period of time, [where] the parties had worked together for the joint acquisition and development of property previous to the particular agreement sought to be enforced." 405 S.W.2d at 337. Stating that there was no prior fiduciary relationship between the parties, the court refused to invoke the remedy of a constructive trust. The court found that the Griffiths acquiesced in the oral nature of the agreement for the simple reason that they trusted the Consolidated Gas official. However, the court recognized "the fact that one businessman trusts another, and relies upon his promise to carry out a contract, does not create a constructive trust. To hold otherwise would render the Statute of Frauds meaningless." *Id.* at 336.

Again in *Rankin v. Naftalis,* 557 S.W.2d 940 (Tex.1977), the Supreme Court of Texas refused to impose a constructive trust on oil and gas lease transactions. The court noted that the parties had been involved in a joint venture. It also recognized that confidential relationships such as partnerships could impose a broader reach for a constructive trust than simple business dealings. However, the court found that the transactions in question were not based upon the joint venture between the parties. It refused to extend a fiduciary duty to cover the business dealings, saying: "[s]ubjective business trust, cordiality and the trust which prevails between businessmen which is the foundation of ordinary contract law" could not be a basis for imposing a trust that would thwart the statute of frauds. 557 S.W.2d at 944.

In *Panama-Williams, Inc. v. Lipsey,* 576 S.W.2d 426 (Tex.Civ.App.—Houston [1st Dist.] 1978), *aff'd after remand,* 611 S.W.2d 917 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.), a pipeline contractor entered into an oral joint venture agreement with another contractor to bid on a major job. When the other contractor backed out of the joint venture, Panama-Williams brought suit seeking, inter alia, imposition of a constructive trust. The trial court gave summary judgment to the defendant, but the appellate court reversed and remanded for trial.

The appellate court recognized that a constructive trust requires "actual fraud or strict proof of a prior confidential relationship and unfair conduct or unjust enrichment on the part of the wrongdoer." 576 S.W.2d at 432. The court was unwilling to find a prior fiduciary business relationship because the only business relationship was that of the joint venture made the subject of the suit. Since the business dealings were no more long-lived than the contract in question, the court refused to find a constructive trust on that ground.

However, the court then considered the long-standing friendship between Panama Shiflett, one of the principals of Panama-Williams, and defendant Lipsey. The court found a long-standing personal relationship apart from the business dealings that influenced the scope of their business contacts. It held that the requisite fiduciary relationship could be satisfied on the basis of moral, social, domestic, or personal relationships. It did not, however, change the established Texas requirement that a claim of such a

prior relationship demands strict proof in order to defeat the workings of the statute of frauds. *Id.* at 432–33.

 In sum, then, the Texas case law imposes two general prerequisites to the imposition of a constructive trust. The first is a prior, unrelated history of close and trusted dealings of the same general nature or scope as the subject transactions. The second is a finding that unjust enrichment would result if the remedy of constructive trust were not imposed. It is to these two inquiries that we now turn.

### III. *Constructive Trust—Principles Applied*

A. Prior history of unrelated dealings.

 To show a constructive trust, a plaintiff must first show, by a preponderance of the evidence, *Putaturo v. Crook,* 653 F.2d 1027 (5th Cir.1981), that the parties had a long-standing fiduciary or confidential, trusting relationship unrelated to the subject transaction. *E.g., Panama-Williams, Inc. v. Lipsey,* 576 S.W.2d 426, 432 (Tex.Civ.App.—Houston [1st Dist.] 1978), *aff'd after remand,* 611 S.W.2d 917 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Tyra v. Woodson,* 495 S.W.2d 211 (Tex.1973). Whether or not a fiduciary relationship exists is a question of fact, *Smith v. Bolin,* 153 Tex. 486, 271 S.W.2d 93, 97 (1954), but whether a relationship is sufficiently long-standing to support imposition of a constructive trust is a question of law. *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 263 (1951). We find as a matter of law that the dealings between Ward and Whatley in this case were not sufficiently longstanding to support the district court's application of a constructive trust.

First, it is clear from the undisputed evidence that the acquisition of the Dyckman tract was part of the overall scheme to acquire the 490 acres. It is of compelling significance in this case that the dealings between Ward and Whatley were not prior, unrelated dealings in real property. Rather, they were all part of a single master plan to acquire the 490 acres. Ward and Whatley had had no business dealings with each other prior to the arrangements to acquire the 490 acres. The findings of the district court confirm that the confidential relationship between Whatley and Ward first arose when Ward became interested in the 490 acres, and that "the agreement to buy the Dyckman property was clearly within the scope of that prior agreement and made in furtherance of the prior agreement." Under such a view, it was clearly erroneous for the district court to suggest that there was any confidential or fiduciary relationship between the two parties before the overall scheme developed. *See Panama-Williams, Inc. v. Lipsey,* 576 S.W.2d 426, 432 (Tex.Civ.App.—Houston [1st Dist.] 1978), *aff'd after remand,* 611 S.W.2d 917 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (contemporaneous business agreements cannot support imposition of a constructive trust). The evidence in this case cannot satisfy the requisite history of prior relationships. *See* Note, *Imposition of a Constructive Trust Based Upon a Breach of a Fiduciary Duty in Joint Venture Situations,* 21 S.Tex.L.J. 229, 232–36 (1981).

Even if the Dyckman tract transaction were independent and not part of the single, overall plan to acquire the 490 acres, it would still be erroneous to create a constructive trust. Ward and Whatley discussed business for the first time in early 1970, their first meeting over the 490 acres. Their plan to acquire the Dyckman tract began in July, 1970, less than six months later. Admittedly, there were several meetings, guarantees of loans, transfers of property, and cash payments flowing between the parties during the first months of 1970. However, no matter how intertwined the parties' financial scheming might have been during that period, a six month old plan to acquire properties does not meet the kind of ongoing, confidential relationship required under Texas law to support imposition of a constructive trust. *See Tyra v. Woodson,* 495 S.W.2d 211 (Tex. 1973) (business relationship from June to October insufficient to support imposition of constructive trust). *Cf. Meadows v. Bierschwale,* 516 S.W.2d 125 (Tex.1974) (constructive trust may not require longstanding relationship where fraud is prov-

en). Even if one were to count the additional time during which Whatley's companies held the tract, it would be difficult on the facts of this case to find a long-lasting, independent relationship between Ward and Whatley or his companies.

The district court found as a fact that Whatley acquired the Dyckman tract on behalf of Ward and with the understanding that it would be transferred to Ward. It is unclear if this finding actually is meant to cover the situation where the overall attempt to obtain the 490 acres failed. Ward, indeed, was calling the shots in mid-1970 as part of the general scheme to get the 490 acres. Ward also provided the down payment money with which Whatley bought the Dyckman tract. The district court recognized that many of the dealings between Ward and Whatley appeared to be interdependent. Most businessmen, for example, would not provide a $20,800 down payment on real estate to a virtual stranger, as Ward did for Whatley and the Athens property dealings, without some hope of personal gain.

Whatley's own company name, however, was on the Dyckman tract deed and the mortgage. Whatley's firm, not Ward, made the mortgage payments and managed the Dyckman property, at least until the firm became insolvent.[4] We accept, nonetheless, the finding of the district court that there was an oral contract under which Whatley would hold the title to the Dyckman tract on behalf of Ward. Yet such an agreement is unenforceable under the statute of frauds for the very reason we have statutes of frauds: to formalize dealings in land so as to avoid the inexactness and possible abuses in proving oral land contracts. Even adding the additional finding of the district court that there was a fiduciary relationship between the two, we conclude that the duty to transfer the property is still unenforceable under the Texas Trust Act as an oral trust to convey real property. Tex.Rev.Civ.Stat.Ann. art. 7425b–7 (Vernon 1960). The business dealings between Ward and Whatley, whatever their nature, were not of sufficient duration or intensity to justify the imposition of a constructive trust. The first of the two requirements to establish a constructive trust was not met.

**B. Unjust Enrichment.**

The other requirement for imposition of a constructive trust is that the court's failure to intervene must cause unjust enrichment. We find this second element required to establish a constructive trust also is lacking.

Unjust enrichment is an equitable principle that recognizes situations where one party has received benefit at the expense of an innocent other person. The mere fact that one party has made a profit, though, is an insufficient ground to order restitution on a theory of unjust enrichment. The profit must be "unjust" under principles of equity. *See Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559 (1948). *See generally* Restatement of Restitution § 1; 66 Am.Jur.2d Restitution and Implied Contracts § 3.

In the case before us, Ward was involved in covert discussions to acquire the 490 acres by rigging the bidding and without letting the Water Board know the true identity of the bidder. The fact that the

---

4. It is not clear that Whatley was intending his management of the Dyckman tract to be at his own expense. On April 21, 1971, notably, Whatley sent Ward a bill for expenses in connection with their land transactions. It was not until April, 1972 that Whatley first mentioned to Ward that he considered himself, not Ward, the beneficial owner of the Dyckman tract. This conversation, in the words of the district court, led to a "physical altercation over the status of their relationship." Soon thereafter, on May 16, 1972, Ward sent Whatley a check for the expenses listed on the April, 1971 bill. Whatley rejected Ward's check.

We do not know if the items listed on the April, 1971 bill were meant to cover all property management expenses related to the Dyckman property. Yet even if they were, this would represent nothing more than Whatley's belief at that time that he was holding the Dyckman property on behalf of Ward. Without a written trust agreement, such an arrangement would be unenforceable under the Texas Trust Act. The exception to this general rule known as "resulting trust" is not raised in this case, and this decision finds the "constructive trust" exception inapplicable.

bidding for the 490 acres and the other tracts was made in the name of other persons was not due to any mistake, duress, or fraud. Ward was a sophisticated businessman who felt a compulsion to keep his name out of the dealings to the extent possible.[5] His decision to allow Whatley to purchase the Dyckman tract was not an oversight but an intentional business strategy. Ward may have subjectively trusted Whatley to transfer the property to him, but his failure to reduce that subjective trust to a written agreement was due to business strategy and not an equitable wrong. It is also questionable whether Ward's concealments and schemes in this deal generally leave him with the requisite "clean hands" for equitable relief.[6]

It is true that leaving the status quo undisturbed in this case will leave Whatley's company with the bulk of the $250,000 proceeds from the foreclosure sale of the Dyckman property. The tract was acquired for $30,500 during the attempt to purchase the 490 acres. Thus, it is clear that Whatley or his companies will realize a large profit from a small financial commitment. Ward points to this gain as evidence of unjust enrichment. He shows that he provided the $5,000 down payment on the property and was expecting to get title to the property in return. He feels that he, not Whatley, is entitled to the bulk of the almost ten-fold increase in the value of the Dyckman property.

▮▮▮ The profit from the Dyckman property is certainly enrichment, but Ward misconstrues the meaning of the term un-

just enrichment. Profits, no matter how large, do not constitute unjust enrichment unless they equitably belong to another person. *See* Restatement of Restitution § 1; 27 Am.Jur.2d Equity § 63; 66 Am.Jur.2d Restitution and Implied Contracts §§ 4–10. Ward might have provided the down payment for the Dyckman tract, but Whatley's companies made the mortgage payments and managed the property until struck by insolvency. This is not a case where one person used the funds of another for the sole purpose of acquiring property for that other person. Rather, Ward provided the down payment in the hope that the overall scheme to buy the 490 acres would bear fruit. The scheme, however, ended in abject failure. The necessary conclusion is that while there may be enrichment (profit), there has been no *unjust* enrichment in this case. This conclusion also compels the holding that the doctrine of constructive trust is inapplicable.

▮▮▮ In summary, Ward's claim for recognition of a constructive trust would fail even if he established one of the requirements but not the other. Ward, however, fails to establish either of the two requirements that would justify a constructive trust. Ward is left asserting his subjective confidence in his verbal dealings with Whatley. Verbal promises to convey real estate are unenforceable under the statute of frauds.

### IV. *Conclusion*

We find that the district court erred in finding a pre-existing confidential relation-

---

5. The bidding on the 490 acres was done on a blind basis. It is difficult to see how the appearance of Ward's name on the bids would influence a blind bidding scheme run by a public agency and open to the general public. However, the Water Board was not forced to accept any of the blind bids and in fact rejected the first two rounds of bidding. Ward might have held a valid belief that the presence of his name would influence the Water Board. There is, however, no requirement in the law that business judgment must be logical or successful, merely that there be a business purpose behind the decision.

6. At the core of Ward's dealings with Whatley was Ward's desire to conceal his own identity

from the Water Board. As part of this plan, he submitted multiple bids in different names for the same land. The district court found that his intent was to manipulate the bidding for the 490 acres and obtain the land at an advantageous price. Whether the total scheme would establish a legal offense, such as fraudulent concealment, is not before us today. However, even if the other requirements of a constructive trust were met on the facts before us, it is possible that Ward would still fail in his claims, under the ancient precept that he who comes into equity must come with clean hands,—a "fundamental of equity jurisprudence." 27 Am.Jur.2d Equity § 136, at 666–67.

ship between Ward, Whatley, and Hart prior to and separate from the Dyckman tract transactions. In addition, the court erred in ruling that Whatley and his companies would be unjustly enriched at Ward's expense if allowed to recover the proceeds of the Dyckman tract foreclosure sale. We therefore hold that it was improper to impose a constructive trust between Ward and Whatley. We do not disturb the portions of the judgment awarding certain sums such as outstanding judgments and attorneys' fees to other parties originally involved in this litigation. Those portions of the judgment were not before us.[7] We reverse that part of the judgment awarding the remainder of the interpleader fund to Ward and render judgment for that amount to Sentry Title Co., Inc., record title holder of the Dyckman property at the time of the foreclosure sale.

REVERSED and RENDERED.

WILL, District Judge, dissenting:

The majority's opinion, which reverses the decision of the District Judge who heard the evidence in this case, has the unfortunate effect of rewarding, to the tune of more than $250,000,[1] appellant Alan D. Whatley (Whatley) who made little or no investment in the nine acre tract known as the Dyckman property but who asserts beneficial ownership of that property, in an admitted breach of his fiduciary obligation to appellee Travis Ward (Ward), and in what is known in the vernacular as a "double cross." Texas law, which is controlling here, does not require this, to me, inequitable and anomalous result.

The majority reaches its conclusion by straining the Texas precedents and, I believe, providing a new statement of Texas law, in contravention of what I understand to be the limited role of federal courts in applying state law. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). By reversing the decision of the District Court, which the majority opinion recognizes is not clearly erroneous, the majority also exceeds, I believe, the limitations normally respected and applied by appellate courts in reviewing trial court decisions. *See* Fed.R.Civ.P. 52(a); *Bryan v. Kershaw,* 366 F.2d 497, 499 (5th Cir.1966), *cert. denied,* 386 U.S. 959, 87 S.Ct. 1030, 18 L.Ed.2d 108 (1967); *Williamson v. Brown,* 646 F.2d 196, 200 (5th Cir.1981).

The District Court's findings of fact are not challenged in this appeal. In its effort to force this case into the mold of *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333 (Tex.1966), the majority opinion overlooks some of those facts and glosses over others in footnotes. I, therefore, undertake my own recitation of the significant facts of the case. The following narration is taken from the District Court's uncontested findings as well as from other undisputed facts.

## I. THE FACTS

This interpleader action arises out of a series of transactions commencing with two or three meetings in January, February or March of 1970 between Ward and Whatley to discuss possible prospective real estate purchases. Ward, a successful business and oil man in Athens, Texas, had long been interested in acquiring some real estate in

---

**7.** The rights of several claimants were settled before the district court entered its final judgment and order. These include those of the IRS and certain lien creditors. The final judgment of the district court ruled that two parties had first rights to recover from the fund. The first was J. Lawson Goggans, the attorney for Dyckman with respect to Dyckman's efforts to collect on the Dyckman tract mortgage. Goggans may recover attorneys' fees and costs of action from the interpleader fund. The second was Larry D. Harris, who acted as substitute trustee with respect to the foreclosure sale of the Dyckman tract. Harris may also recover

attorneys' fees and costs of action from the interpleader fund. Whatley and Home Engineering should recover costs of action from Ward. All other parties shall bear their own costs. The remainder of the interpleader fund shall be awarded to Sentry Title Company, Inc., record title holder of the Dyckman property at the time of the foreclosure sale.

**1.** At oral argument, counsel advised that the interpleaded fund here involved, as a result of interest earned thereon, now exceeds $250,000 although the exact amount was not specified.

the Cedar Creek Lake area of Henderson County, Texas, 490 acres of which were owned by the Tarrant County Water Control and Improvement District Number One (Water Board). Whatley was a successful land developer in the area around Henderson County. Since the 1960's, Ward had been acquainted with, and on occasion represented by, one William F. Hart (Hart), an attorney and former Henderson County Judge. Ward and Hart and Ward and Whatley had conversed in 1969 about a $50,000 loan from the State National Bank (State National), in Corsicana, Texas, of which Ward was Chairman of the Board. The loan, which fell through, was intended to be used by a 50–50 partnership of Hart and Whatley to purchase property along Cedar Creek Lake.

The next time Ward and Whatley met was in early 1970. One of the subjects discussed at that time was the 490 acre tract owned by the Water Board. On January 30, 1970, Whatley made the first of a number of offers or bids to the Water Board for the 490 acre tract.

At some of the Ward-Whatley meetings, Hart, who was acting as Whatley's attorney, and Ward's attorney Willis Moore (Moore) were also present. They discussed, among other things, the possibility of Ward's acquiring the 490 acres and the acquisition by one or the other or jointly of other properties including 16 acres in downtown Athens, Texas known as the LaRue tract and 9 acres adjoining the 490 acre tract. The 9 acres were known as the Dyckman property and possessed an easement over the 490 acres owned by the Water Board.

As one result of these conversations, Home Engineering, Inc. (Home), owned by Whatley, received the proceeds of a loan in the amount of $20,800 from State National on Ward's oral assurances that he would pay the note himself and the bank would get its money back. That money was used by Whatley in the acquisition on April 2, 1970 of the LaRue property in Athens, the total purchase price of which was approximately $80,000. The loan was made in the name of Home and guaranteed by Ward, though all understood that Ward would pay

it, since Ward was an officer and the principal stockholder of State National. Ward obtained a renewal of that loan on October 8, 1970 and ultimately did pay it off. The LaRue property was later conveyed without Ward's knowledge by Home to A.D.W. Enterprises (ADW), another Whatley-owned company, which later conveyed it to Computer Land Title, Inc. (Computer), another Whatley company. The deed of conveyance from Home to ADW was not recorded until some eight months after its purported date.

The District Court found that during the conversations in early 1970, Whatley and Hart agreed to help Ward submit a bid on the 490 acres in return for which Hart was to receive $30,000 to $35,000 if Ward obtained the tract and Whatley was to be compensated by Ward's paying off the $20,800 loan to Home, which he ultimately did. For various reasons, including Ward's fear that the price would go up if his interest was disclosed, it was proposed to make the bids on the 490 acres in other persons' names.

Accordingly, on July 6, 1970, a bid of $480,000 for the 490 acres was submitted to the Water Board by Hart for Ward as the undisclosed principal. Also on July 6, Ward submitted a bid of $511,000 in the name of one of his own companies, Pan American Properties, and Home submitted a bid of $771,750 also for Ward as the undisclosed principal. The plan was that, if Pan American Properties' bid was the second highest, Home would withdraw its bid. If no other bids were received, presumably both Home and Pan American would withdraw their bids. The plan failed when a fourth bid of $748,230 was also submitted on July 6 which the Water Board determined to be the most advantageous to it of the four bids submitted.

Between July 6 and July 28, 1970, Ward, Whatley and Hart had two meetings at which they discussed the possibility for tactical purposes of acquiring the Dyckman property with its easement over the 490 acre tract. Whatley and Hart had earlier entered into negotiations with Dyckman to purchase the 9 acres. About July 24, Home acquired the Dyckman property for $30,500

with a down payment of $5,000 provided by Ward and a promissory note executed by Home in the amount of $25,500 and secured only by a vendor's lien and deed of trust on the property. Ward also gave Hart $600 to pay for travel expenses in connection with the acquisition of the Dyckman property.

Hart flew to Canada to meet with Dyckman and took with him a cashier's check for the $5,000 arranged for by Ward. Whatley later contended that the $5,000 was a loan which he repaid on November 16, 1970 by conveying, at Ward's request, a lake lot he owned worth between $4750 and $6500 to Ward's friend, M.O. Atterbury. Ward denied that the $5,000 was a loan or that the transfer to Atterbury was its repayment. The District Court which heard the evidence found that Home through Hart had acquired the Dyckman property on behalf of Ward and that the conveyance to Atterbury was not in repayment of the $5,000.

At about the same time, June-July 1970, Ward, Whatley and Hart agreed that they would attempt, also for tactical purposes, to acquire a possible lawsuit against the Water Board with respect to 29 of the 490 acres which the Water Board had purchased from Jack and Pauline Lacy (the Lacys). The objective was to enhance their efforts to acquire the 490 acres for Ward. The theory of the lawsuit was that the Lacys were entitled to a reversion of title to the 29 acres because of certain alleged misrepresentations made to them by the Water Board at the time of condemnation. Ward, Whatley and Hart agreed that the Lacys should be offered $10,000 payable when and if the suit was won plus any amounts they had to repay the Water Board for the reversion. Ward was to and did pay all expenses in connection with the suit.

In August 1970, Whatley acquired the right to file the suit in the Lacys' name and Moore, Ward's attorney filed it. Later, another attorney was retained and also paid by Ward to assist Moore in prosecuting the suit. In June 1971, Moore and Ward attempted unsuccessfully to negotiate a settlement of the suit as part of Ward's acquisition of the 490 acres.

At the July 29, 1970, meeting of the Water Board, all the July 6 bids for the 490 acres were rejected and new bids were set to be received some fifteen months later on October 15, 1971. On that date, two bids were submitted. One, by Whatley, with Sentry as the nominal bidder, was for $750,-000. The second bid was for $801,150. Both were rejected and on February 10, 1972 yet another set of bids was taken by the Water Board and three bids were received. Sentry's bid of $807,256 was high and the property was sold to Sentry on May 25, 1972. Sentry both on October 15, 1971 and on February 10, 1972 was bidding for Whatley and not for Ward. Ward did not bid at either date on the 490 acres because he believed the price sought by the Water Board was too high.

In April 1972, twenty-one months after its acquisition by Hart for Ward in Home's name, Whatley for the first time advised Ward that he did not recognize that Ward had any interest in the Dyckman property which had been acquired on July 24, 1970, and later conveyed by Home to Sentry after the latter was organized. Prior to April 1972, Ward had not been aware that Home and Whatley were claiming any interest in the Dyckman property adverse to his. In fact, a year earlier on April 21, 1971, Whatley had sent Ward a bill for expenses he had incurred in connection with both the LaRue (Athens) and Dyckman properties, including the first interest payment on the $25,500 note, presumably on the premise that the expenses had been incurred for Ward's benefit as the beneficial owner. *See* District Court Findings of Fact # 27.

At Moore's instigation, Ward, Whatley, Moore and Hart met some time after Whatley, in April 1972, advised Ward that he did not recognize any interest of Ward in the Dyckman property. At that meeting, Ward and Whatley came to blows and no agreement was reached. On May 16, 1972, Ward sent Whatley a check for $18,672.50 to cover all past and future interest payments and other expenditures which Whatley would make on the Dyckman property. *See* Tr. 175–78. Whatley returned the check.

In August 1972, Ward filed suit in Henderson County against Whatley, Home, and Community Engineering, Inc. (Community), another Whatley company, asserting an equitable claim to the Dyckman property. Later he joined Sentry, to whom Home had conveyed the property, as a defendant. Sentry defaulted in that action, Ward nonsuited the other defendants and obtained a default judgment against Sentry which became final. He then immediately refiled against the other defendants. At the time Home conveyed the Dyckman property to Sentry, January 22, 1973, Ward's suit was on file and constituted notice to Sentry of his claim to an interest in the property.

Subsequently, in 1973, when Ward learned that Home had conveyed the Dyckman property to Sentry and that Dyckman was about to foreclose his vendor's lien and trust deed since payments on the note were in default, at Moore's suggestion, Ward agreed to purchase the $25,500 Dyckman note. Moore was concerned that a bona fide purchaser might defeat Ward's equitable claim to the property being asserted in the pending lawsuit. Ward and Moore arranged for one John Bob Robinson (Robinson) to attempt to acquire the note from Dyckman. Robinson did so and subsequently assigned the note to Ward. Ward's recollection was that he, through Robinson, paid Dyckman some $38,000 for the note which had a provision for increase in principal to reflect changes in the Consumer Price Index. See Sentry Exh. # 5.

At the foreclosure sale, Moore bid $250,000 for the Dyckman tract on behalf of Ward and obtained a Substitute Trustee's Deed to the property. It is the entitlement to the net proceeds of that transaction which is the subject matter of this lawsuit.

As indicated, this is an interpleader action brought originally by Larry D. Harris (Harris), the trustee under the foreclosed Deed of Trust and the holder of the proceeds of the sale of the Dyckman property. Harris sought a determination of the owner of the net proceeds of the $250,000 from the foreclosure sale at which Moore on behalf of Ward bought the property. The proceeds were placed in the registry of the court. After allowing claims of the IRS for taxes and attorneys' and trustee's fees, the District Court entered Findings of Fact and Conclusions of Law awarding the net proceeds to Ward. It is from that award that Sentry, Home and Whatley appeal.

## II. THE LAW

Several basic questions of Texas law are here involved. The Texas Statute of Frauds, Tex.Bus. & Com.Code Ann. sec. 26.-01 (Vernon 1968), provides in relevant part that no action shall be brought in any court upon a contract for the sale of real estate or the lease thereof for a term longer than one year unless the promise or agreement upon which the action is brought, or some memorandum thereof, is in writing and signed by the party to be charged. And the Texas Trust Act, Tex.Rev.Civ.Stat.Ann. art. 7425b–1, et seq. (Vernon 1960) provides in relevant part that no trust in relation to or consisting of real property shall be valid unless created, established or declared by a written instrument subscribed to by the trustor or by his agent duly authorized in writing. The Trust Act, however, specifically provides that it does not apply to a constructive or resulting trust.

The District Court determined that a constructive trust existed between Ward and Whatley as to the Dyckman property. It held that Ward had established by a preponderance of the evidence, as required by *Putaturo v. Crook,* 653 F.2d 1027, 1029 (5th Cir.1981), that a confidential or fiduciary relationship existed between him and Whatley prior to and apart from their Dyckman property dealings, *see Consolidated Gas & Equipment Co. v. Thompson, supra,* 405 S.W.2d at 337, and that the agreement sued upon was within the scope of their prior dealings, as required by *Rankin v. Naftalis,* 557 S.W.2d 940, 944 (Tex.1977). The Court also found that it would be inequitable to permit Whatley to retain the proceeds from the sale of the Dyckman property and that, even absent a written agreement, a confidential or fiduciary relationship could arise from a purely personal or informal relationship where trust and confidence had been reposed by the parties by reason of that relationship. The Court did not discuss

whether the facts here gave rise to a resulting trust, presumably because it was satisfied that they did establish a constructive trust.

The trial court found that the fiduciary relationship existed between the parties here, prior to and apart from any agreement with respect to the Dyckman property, when Whatley and Hart agreed in early 1970 to assist Ward in acquiring the 490 acres for which assistance Ward was to pay Hart $30,000–$35,000 and to pay the $20,800 loan of Home at State National which Whatley had used to acquire the LaRue (Athens) property. The trial court held further that the relationship extended to all the other ventures, such as the Lacys' lawsuit and the placing of bids with the Water Board, in which the parties joined and which were related to their efforts under the agreement to assist Ward in acquiring the 490 acres, and that to allow Whatley and Sentry any interest in the proceeds of the sale of the Dyckman property would unjustly enrich them.

Accordingly, the District Court found that Home and Whatley, as its owner, had acted in a fiduciary capacity in the acquisition of the Dyckman tract (the successful negotiations were actually conducted by Hart), and that therefore Home and subsequently Sentry held title to the property in constructive trust for Ward. Whatley's refusal in April 1972 to have Home transfer title to Ward was, accordingly, a breach of that fiduciary relationship and the constructive trust.[2]

Since it is undisputed that none of the understandings between the parties were in writing, the only question to be resolved is whether the trial court properly found that, under all the facts, a constructive trust was created or, alternatively, a resulting trust was created, or whether all that existed was an oral contract to convey real estate which is unenforceable under the Statute of Frauds or an oral trust with respect to real estate which is unenforceable under the Texas Trust Act.

As the majority recognizes, the Texas Supreme Court has recently emphasized that there is no "unyielding formula" for determining whether a constructive trust should be decreed and that the facts of each individual case must determine the appropriate relief. *Meadows v. Bierschwale,* 516 S.W.2d 125, 131 (Tex.1974). That a court of equity should respond flexibly to the facts before it, applying broad, general principles of fairness, is no recent innovation in the long development of the Texas law of constructive trusts. *See also, e.g., MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334, 337 (1944) ("[n]o rules can be prescribed and no attempt should be made to formulate rules for the measurement of conduct by courts of equity"); *Pope v. Garrett,* 147 Tex. 18, 211 S.W.2d 559 (1948); *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 260–62 (1951); *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 560 (1962) (quoting *MacDonald v. Follett, supra* ); *Panama-Williams, Inc. v. Lipsey,* 576 S.W.2d 426, 432 (Tex.Civ.App. 1978), *aff'd after remand,* 611 S.W.2d 917 (Tex.Civ.App.1981). *And see also Gertner v. Hospital Affiliates International, Inc.,* 602 F.2d 685, 687 (5th Cir.1979). And consistent with this view of the broad, flexible posture of equity in imposing the constructive trust remedy, the Texas Supreme Court in *Fitz-Gerald v. Hull, supra,* long ago adopted the definition of constructive trust contained in the Restatement of Restitution sec. 160, as follows:

> Where a person holding title to property is subject to an equitable duty to con-

---

2. The majority suggests that it is unclear if the District Court finding that Whatley was obligated to transfer the Dyckman property to Ward was meant to cover the situation where the efforts to obtain the 490 acres for Ward failed. The District Judge made his finding more than ten years after Ward abandoned his interest in the 490 acres. Based in part on that finding, he found that Whatley had breached his fiduciary duty to Ward in asserting a beneficial interest in the Dyckman property and refusing to convey it to Ward. I find no ambiguity in the trial judge's finding. Whatley acquired the Dyckman tract with Ward's money for his benefit and with the understanding that he was holding it for Ward regardless of what happened to the 490 acres. If Ward acquired the 490 acres or not, Whatley had no equitable right to the Dyckman property and until April of 1972 he claimed none.

vey it to another *on the ground that he would be unjustly enriched if he were permitted to retain it,* a constructive trust arises. [Emphasis added.]

Moreover, it is also a firmly established principle of the Texas law of constructive trusts, which neither the majority nor the appellants dispute, that the "fiduciary" or "confidential" relationship necessary to give rise to "an equitable duty to convey" is a correspondingly flexible concept not subject to or governed by any set of technical prerequisites such as those necessary for a finding of partnership or joint venture. *See, e.g., Gaines v. Hamman, supra,* 358 S.W.2d at 560–61; *Cartwright v. Minton,* 318 S.W.2d 449, 453 (Tex.Civ.App.1958); *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 407–09 (1960); *Smith v. Bolin,* 153 Tex. 486, 271 S.W.2d 93, 97 (1954); *Fitz-Gerald v. Hull, supra,* 237 S.W.2d at 261.

Although there may be a question of fact, *Smith v. Bolin, supra,* 271 S.W.2d at 97, whether the circumstances of a particular case warrant the finding that justifiable trust and confidence were reposed in the one against whom a constructive trust is sought to be decreed, *see Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962), I find nothing in the Texas cases to limit or qualify the Texas Court of Appeals' observation in *Cartwright v. Minton, supra,* that

> "The term 'fiduciary' is derived from the civil law. It is impossible to give a definition to the term that is comprehensive enough to cover all cases. Generally, speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith rather than legal obligation, ... The term includes those informal relations which exist whenever one party trusts and relies upon another, as well as technical fiduciary relations."

318 S.W. at 453. It bears emphasis that there is no challenge to the District Court's factual finding, which is accepted by the majority, that there was a fiduciary relationship between Ward and Whatley antedating their decision to acquire the Dyckman property.

Despite the foregoing, and without citation to any supporting Texas authority, the majority concludes that Texas case law imposes two absolute prerequisites to the imposition of a constructive trust: (1) a longstanding fiduciary or confidential trusting relationship unrelated to the subject transaction *and* (2) that unjust enrichment would result if a constructive trust was not imposed. Majority Opinion at 13.

With all due respect, the majority's restatement of the Texas law in such absolute terms is not reflected in any Texas decision and has the unfortunate defect of obscuring the one certain principle of the Texas law of constructive trusts, which is repeatedly emphasized in the decisions cited above, that the cases are to be dealt with on their individual facts, applying principles of equity and fairness.

I have searched in vain for a single Texas decision that applies the two-prong test for constructive trust that the majority announces today. It is certainly true that, since the decision in *Consolidated Gas and Equipment Co. v. Thompson, supra,* many Texas courts have concluded that, absent a so-called "formal" fiduciary relationship, like that between attorney and client, a finding of constructive trust depends on the existence of a confidential or fiduciary relationship separate and apart from the transaction in issue. *See, e.g., Panama-Williams, Inc. v. Lipsey, supra,* 576 S.W.2d at 433. Accordingly, some cases deny the constructive trust remedy either on the basis of a finding that there was no relationship between the parties prior to the subject transaction, *see Tyra v. Woodson,* 495 S.W.2d 211 (Tex.1973); *Karnei v. Davis,* 409 S.W.2d 439 (Tex.Civ.App.1966); *Hawkins v. Haffa,* 469 S.W.2d 733, 739–40 (Tex.Civ.App.1971); *Linder v. Citizens State Bank of Malakoff, Texas,* 528 S.W.2d 90, 94 (Tex.Civ.App. 1975); *Thomson v. Norton,* 604 S.W.2d 473, 476 (Tex.Civ.App.1980), or on the basis that, while the parties did have a prior relationship, it was not fiduciary or confidential in character, *see Gasperson v. Christie, Mitchell & Mitchell, Co.,* 418 S.W.2d 345, 356 (Tex.Civ.App.1967); *Patton v. Callaway,* 522 S.W.2d 252 (Tex.Civ.App.1975); *Marut*

*v. Collier,* 583 S.W.2d 682, 684–85 (Tex.Civ. App.1979).

However, I do not find an absolute requirement in any of these cases that the prior relationship have been of many years' or "long" standing. And since the unchallenged finding of the District Court here is that there was a fiduciary relationship between Ward and Whatley prior to and independent of their decision to have Whatley take record title to the Dyckman property, none of these cases supports the majority's result.

Further, there is express authority in the Texas cases that the two prongs isolated by the majority are not the sole factors governing the imposition of a constructive trust. The majority's rule does not, for example, adequately deal with *Meadows v. Bierschwale, supra,* decided by the Texas Supreme Court in 1974, which holds that the constructive trust remedy may be applied in a suit for rescission of a land conveyance even in the absence of any prior relationship between the parties where there is evidence and a finding of actual fraud in the transaction. 516 S.W.2d at 128–29. *See also Maykus v. First City Realty and Financial Corp.,* 518 S.W.2d 887, 896 (Tex.Civ.App.1974) (letter of intent provides documentary proof of the confidential relationship of a present joint venture and, for purposes of constructive trust remedy, is "equivalent" to proof of a preexisting, separate confidential relationship).

Finally, the majority's two-pronged rule implicitly assumes that certain of the older Texas Supreme Court cases, in which the constructive trust remedy was imposed without a finding of any "long-standing fiduciary or confidential, trusting relationship unrelated to the subject transaction," *see, e.g., MacDonald v. Follett, supra; Edwards v. Strong,* 147 Tex. 155, 213 S.W.2d 979 (1948); *Fitz-Gerald v. Hull, supra,* are of no continuing validity after *Consolidated Gas & Equipment Co. v. Thompson, supra.*

There is no explicit Texas authority of which I am aware to support this assumption and, indeed, there is post-*Consolidated Gas* authority affirming the continued validity of the leading cases. *See, e.g., Tuck v. Miller,* 483 S.W.2d 898, 905–06 (Tex.Civ. App.1972).

The *Consolidated Gas* decision itself, the decision upon which the majority and the appellees primarily rely, contains no reference whatsoever to "unjust enrichment," the second prong of the majority's two part test[3]. Moreover, *Consolidated Gas* does not signal a radical narrowing of the availability of the constructive trust remedy in Texas. Since that decision, the Supreme Court of Texas, *Meadows v. Bierschwale, supra,* 516 S.W.2d at 131, and this court, *Gertner v. Hospital Affiliates International, Inc.,* 602 F.2d at 687, have expressly reaffirmed that whether the constructive trust remedy is to be imposed depends on the particular facts before the court.

In *Consolidated Gas,* the Texas Supreme Court found that "the proof in this case," 405 S.W.2d at 337, failed to establish a constructive trust but showed at most either an oral contract to convey an interest in realty or an oral trust, neither of which was enforceable under the Texas Statute of Frauds or the Texas Trust Act. The facts in the case were that C.A. and D.A. Griffith (father and son—the Griffiths) orally agreed with L.B. Newman (Newman), president of Consolidated Gas & Equipment Company of America (Consolidated) to assist him in securing oil and gas leases on properties, particularly those located adjacent to producing properties.

When Newman indicated he wanted a lease on a particular property, D.A. Griffith (D.A.) found that he could not get it fast enough and enlisted the assistance of Thompson, who then worked for Consolidated. D.A. agreed to give Thompson a one-third interest in the Griffith's one-sixteenth royalty if he could obtain the lease. That

---

**3.** It is perhaps ironic, in light of the frequent statement in the Texas cases that prevention of unjust enrichment is the purpose of the constructive trust remedy, *see, e.g., Fitz-Gerald v. Hull, supra,* 237 S.W.2d at 261, that there is even an indication in at least one Texas case that prevention of unjust enrichment may, in fact, not be a prerequisite to the remedy. *See Holland v. Lesesne,* 350 S.W.2d 859, 862–63 (Tex.Civ.App.1961).

agreement (between the Griffiths and Thompson) was reflected in a written document which included a reference to a "promissory agreement" on the part of Newman to give the Griffiths and Thompson a one-sixteenth override under the lease. Thompson secured the lease in the name of Consolidated.

The Texas Supreme Court found that the Statute of Frauds and the Texas Trust Act made the alleged oral agreement between the Griffiths and Newman unenforceable. In so holding, it opined, 405 S.W.2d at 336,

> The fact that people have had prior dealings with each other and that one party subjectively trusts the other does not establish a confidential relationship.

It went on to say, ". . . the fact that one businessman trusts another, and relies upon his promise to carry out a contract does not create a constructive trust." Rather, ". . . there must be a fiduciary relationship before, and apart from, the agreement made the basis of the suit." Finally, it offered the general observation that a fiduciary relationship between businessmen who were not joint venturers could arise "where, over a long period of time, the parties had worked together for the joint acquisition and development of property previous to the particular agreement sought to be enforced." Since it found no such relationship, the Court held that no constructive trust had been established in the particular case.

The factual and equitable differences between *Consolidated Gas* and the instant case are obvious. In the former, the Griffiths invested no money in acquiring the leases. Here, Ward furnished all the money to acquire the Dyckman property. The alleged agreement between the Griffiths and Newman related to a single lease. The dealings between Ward and Whatley related to a number of transactions, including the 490 acres owned by the Water Board, the LaRue (Athens) property, the Dyckman property and the Lacys' reversionary claim lawsuit.

With respect to each of these, Ward furnished all the cash until such time as he abandoned his interest in acquiring the 490 acres. He paid the $20,800 note, the proceeds of which Whatley used to acquire the LaRue (Athens) property. He paid the $5,000 down payment plus some $600 in Hart's travel expenses to acquire the Dyckman tract and ultimately purchased the $25,500 note which Home gave Dyckman for the balance of the purchase price. He paid all expenses in connection with the Lacys' lawsuit.

In *Consolidated Gas,* one of the parties, Newman, was dead and the only testimony as to the oral understanding came from those seeking to establish the constructive trust. In *Consolidated Gas,* the Griffiths and Thompson sought some $16,000 in royalties under the one-sixteenth overriding royalty, a royalty based on Thompson's securing a lease at a time when he was employed by Consolidated, probably a breach of his duty to his employer. Here, Whatley seeks $250,000 for which he made no investment and for an interest to which he did not claim any entitlement until April 1972, almost two years after the acquisition of the property and one year after he had billed Ward seeking reimbursement of the money he had spent in the Dyckman transaction, an obvious acknowledgment that Ward was the beneficial owner of the property. In *Consolidated Gas,* the Court found evidence only of a unilateral subjective trust on the part of the Griffiths, no mutual or reciprocal trust on the part of Newman.

Even assuming, which it does not, that *Consolidated Gas* imposes an absolute and inflexible requirement of a "prior and separate fiduciary relationship" and states, as an unyielding rule, that isolated business transactions fall outside the scope of the constructive trust doctrine, *see Tyra v. Woodson,* 495 S.W.2d 211 (Tex.1973), it does not follow, on this record, that Whatley should or must be awarded this undeserved windfall for his breach of trust. But neither *Consolidated Gas* nor any other Texas authority that I have found requires or even directly supports the majority's holding that "[t]he business dealings between Ward & Whatley . . . were not of sufficient duration or intensity to justify the imposition of a constructive trust." Majority

Opinion at 949. Indeed, review of the cases cited above—consistent with the flexible principles of equity—yields no such absolute rule and very little discussion of what "duration" in months or years or level of "intensity" of prior dealings is necessary to sustain a constructive trust.

Here, while the relationship between Ward and Whatley was not one of many years' standing, it did involve a number of distinct transactions in each of which there apparently was mutual trust and confidence. Whatley trusted Ward to pay the $20,800 Home loan from State National used by Whatley to purchase the LaRue (Athens) property and Ward paid it. Ward trusted Whatley to negotiate and obtain an assignment of the Lacys' possible claim against the Water Board which Whatley did on the understanding that Ward would pay all expenses in connection with the suit, which he did. Until such time as Ward lost interest in the 490 acre tract, Whatley submitted bids admittedly on Ward's behalf. Hart, on behalf of Ward, negotiated the acquisition of the Dyckman tract with funds provided by Ward who also paid his expenses although title was vested in Home, a Whatley company, which also executed the note and trust deed for the balance of the purchase price, a note ultimately paid by Ward.

Exactly how long the relationship between Whatley and Ward existed is not entirely clear. The original conversations took place in January, February or March of 1970. The LaRue (Athens) property was acquired on April 2, 1970 with the proceeds of the $20,800 loan. It was a six-months note and Ward had it renewed on October 1, 1970. The record does not indicate when he paid it off but it apparently was some time in 1971. As a result of meetings in July 1970, the Dyckman property was acquired on July 24 and the assignment of the Lacys' rights to sue the Water Board in August of 1970. Bids on behalf of Ward were made by Whatley as late as July 6, 1970 and Ward and Moore attempted unsuccessfully in June of 1971 to negotiate a settlement of the Lacys' lawsuit as part of Ward's acquisition of the 490 acres. On April 21, 1971, Whatley sent Ward his bill for expenses he had incurred in connection with both the LaRue and Dyckman properties. Not until April 1972, a year later, did Whatley inform Ward that he was denying that Ward had any interest in the Dyckman property.

Depending on what facts are deemed determinative of the termination of the relationship, it would appear that it lasted at least some eighteen months until mid-1971, since Whatley was billing Ward for expenses in April of that year, Ward was still endeavoring to secure the 490 acres in June of that year and Whatley did not submit a bid for the 490 acres on his own behalf until October 1971. If one takes the date on which Whatley first told Ward he did not recognize any interest of the latter in the Dyckman property as the termination date, the relationship existed until April 1972, more than two years after its inception in early 1970.

Whatley has not challenged the District Court's Findings of Fact and there is substantial evidence to support them. They are certainly not clearly erroneous. Accordingly, we are bound to accept them. See Bryan v. Kershaw, supra, 366 F.2d at 499; Williamson v. Brown, supra, 646 F.2d at 200.

Based on those findings and applying Texas constructive trust law which involves a case-by-case analysis of all the facts and circumstances of the relationship between the parties, the trial judge found that a fiduciary relationship existed between Whatley and Ward and that a constructive trust existed with respect to the Dyckman property of which trust Ward was the beneficiary. Unless we conclude that Texas law absolutely requires a longer and more comprehensive relationship than the relationship indicated by the numerous activities in which Ward and Whatley engaged over a period of eighteen to twenty-seven months, the District Court's conclusions of law are clearly correct under Texas trust law. Whatley and Ward certainly reposed mutual confidence and trust in each other with respect to a number of interrelated but

distinct transactions, which confidence and trust, it should be noted, were respected and not violated in any instance by all involved except Whatley. I find nothing in the Texas cases which would compel the conclusion that Judge Hill erroneously found a constructive trust. *Cf. e.g., Sanchez v. Matthews,* 636 S.W.2d 455, 458–59 (Tex.Civ.App.1980).

Judge Hill also found that Whatley and his company, Sentry, would be unjustly enriched if they were permitted to retain the proceeds from the sale of the Dyckman property and that it would be inequitable for them to do so. Given all the facts, this is an obviously correct conclusion. With little or no investment, they would receive over $250,000. In *Fitz-Gerald, supra,* one of the leading Texas cases on constructive trusts, the Texas Supreme Court adopted the Restatement definition that a constructive trust arises when "a person holding title to property ... would be unjustly enriched if he were permitted to retain it, ..." *see also Panama-Williams, Inc. v. Lipsey, supra,* 576 S.W.2d at 433.

The majority, however, inexplicably concludes that Whatley will not be unjustly enriched because Ward did not have "clean hands" in his dealings with the Water Board. Whether or not that is true, it is irrelevant. As previously pointed out, Ward faithfully carried out every commitment he made to Whatley. He paid off the $20,800 loan from State National, the proceeds of which Home used to purchase the LaRue (Athens) property. He paid all costs and expenses with respect to the Lacys' claim. He paid the purchase price for the Dyckman property, the $5,000 down payment and later purchased the $25,500 note. He even paid Hart $600 in expenses to go to Canada to negotiate the purchase of the Dyckman property.

Thus, whatever the cleanliness of Ward's hands with respect to the Water Board, it is perfectly clear that, with respect to Whatley, they were "clean." And it has long been understood both elsewhere, *see, e.g., Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349 (9th Cir.1963), and in Texas, *see Omohundro v. Matthews, supra,* 341 S.W.2d at 410, that the clean hands defense is only available where the plaintiff's hands have become dirtied vis-a-vis the one against whom he asserts his equitable claim. The only party with "dirty hands" here is Whatley. As the trial judge found, and the majority does not dispute, he breached his fiduciary duty to Ward. The majority is applying the "clean hands" doctrine to the wrong party.

The majority also suggests that, while they recognize Whatley clearly will be greatly enriched, he will not be unjustly enriched since Whatley's companies made the mortgage payments and managed the Dyckman property until struck by insolvency. This is ironical to say the least. Whatley billed Ward in 1971 for his expenditures on both the Dyckman and LaRue (Athens) properties and then, after changing his position and asserting beneficial ownership of the Dyckman property in 1972, refused to accept payment. It seems obvious that at the time he made the expenditures, he did so on the assumption he was making them for Ward's benefit and would be reimbursed. Any amount he is now out-of-pocket is the result of his rejection of Ward's check.

The total bill for both properties was $18,672.50. The record indicates that no more than $4,892.50 could have related to the Dyckman property surveying and interest expenses. Two hundred fifty thousand dollars is certainly unjust enrichment to a man who invested little or nothing, claimed reimbursement for what little he may have invested and then breached his fiduciary duty by belatedly claiming a beneficial interest in the property and double-crossing the man who provided all the funds in their dealings.

As an overall matter, Whatley has already received $20,800, the proceeds of the State National loan which Ward paid. The majority proposes to award him an additional sum, of more than $250,000, for a total of more than $270,000. For admittedly faithless conduct, this is rich reward.

To reverse the trial judge to achieve such a result is to me totally inexplicable. Rather than straining to find Texas law, or

worse, to enunciate new Texas law, to reverse a just and equitable decision, I would assume an appellate court would seek to affirm such a decision based on undisputed findings of fact and legal conclusions consistent therewith. Judge Hill's decision is sound in law and in equity and deserves to be affirmed.

As previously noted, resulting as well as constructive trusts are an exception to the Texas Trust Act's inhibition against oral real estate trusts. While I think the facts here clearly warrant the District Judge's finding of a constructive trust, those findings also, in my opinion, clearly establish a resulting trust. As the majority recognizes, a resulting trust arises when one party buys real property with the funds of another with the understanding that the property is being held for the party that provided the money. The majority asserts that the resulting trust analysis does not apply in this case because the evidence fails to demonstrate an intent to establish a fiduciary relationship.

The District Court found, however, that such a fiduciary relationship had been established, that Whatley or his companies had purchased and held the Dyckman property with Ward's money and for his benefit and that Whatley's refusal to convey the property to Ward was a breach of that fiduciary duty. Those uncontested findings, it seems obvious to me, establish a resulting trust. *See, e.g., Atkins v. Carson,* 467 S.W.2d 495, 500 (Tex.Civ.App.1971); *Grasty v. Wood,* 230 S.W.2d 568 (Tex.Civ. App.1950); *cf. Carson v. White,* 456 S.W.2d 212 (Tex.Civ.App.1970) (no resulting trust absent evidence of the source of the funds used to purchase the property).

The fact that Ward has not urged the resulting trust analysis or that the District Court found a constructive trust rather than a resulting trust or both does not change the facts or warrant the majority's dogged refusal to acknowledge that Texas law would impose a resulting trust on the basis of those unchallenged facts. All concerned understood that Whatley was acting in connection with the Dyckman property on behalf of Ward until 1972 when Whatley for the first time sought to deny it. Unless

this Court rejects the District Court's uncontested findings, which it is my understanding an appellate court may not do, all the elements of a resulting trust are here present.

Two other matters concern me. First, while I agree with the District Court's finding that Ward is entitled to the interpleaded funds, if equity is to be accomplished, Whatley or his companies, notwithstanding their refusal to accept Ward's check in payment thereof, are entitled to be reimbursed for any out-of-pocket expenses which they incurred with respect to the Dyckman property. Accordingly, I would remand to the trial court with instructions to enter a judgment consistent with this opinion.

Second, the record indicates that Ward purchased the $25,500 note secured by the vendor's lien and trust deed from Dyckman in 1973 prior to the foreclosure for some $38,000. The record does not indicate that he recovered that amount. This may be because, in light of the District Judge's decision, the question was moot. If Whatley is to receive the proceeds of the foreclosure sale, however, certainly Ward, as the holder of the trust deed, is entitled to recover with interest the amount he paid Dyckman. It may be that Ward has previously recovered that amount, although Whatley's trial brief indicates that Ward has not. If not, he should certainly do so now although the majority does not deal with the question.

### III. CONCLUSION

Given the uncontested facts found by the District Court, my reading of Texas trust law and my understanding of the role of a federal appellate court, I would affirm, remanding only to permit appellees to be reimbursed for any out-of-pocket expenses they incurred with respect to the Dyckman property. I cannot in good conscience join in a decision which will reward perfidy and breach of trust with more than $270,000, an amount which, even in Texas, must be substantial.